Opinion
BROWN, J.—
“In the history of this Court and this country, few questions have been more divisive than those arising from governmental action taken on the basis of race.” (Fullilove v. Klutznick (1980) 448 U.S. 448, 516 [100 S.Ct. 2758, 2794, 65 L.Ed.2d 902] (conc. opn. of Powell, J.); see also DeFunis v. Odegaard (1974) 416 U.S. 312, 350 [94 S.Ct. 1704, 1722, 40 L.Ed.2d 164] (dis. opn. of Brennan, J.).) In November 1996, the California voters added yet another chapter to the long and tortuous history of this question when they approved Proposition 209, which amended our Constitution to prohibit the state and its political subdivisions from “discriminating] against, or granting] preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.” (Cal. Const., art. I, § 31.) Subsequent to the approval of Proposition 209, the City of San Jose adopted a program that requires contractors bidding on city projects to utilize a specified percentage of minority and women subcontractors or to document efforts to include minority and women subcontractors in their bids.
The question before the court is whether this program contravenes article I, section 31 of the California Constitution. Although the precise issue is a *542 narrow one, the electorate did not approve Proposition 209 in a vacuum. Quite the contrary. Thus, while it may be possible to resolve the matter, as do the Chief Justice and Justice Kennard, simply by relying on differences between Proposition 209 and title VII of the Civil Rights Act of 1964 or on the plain meaning of the initiative’s language, we can discern and thereby effectuate the voters’ intention only by interpreting this language in its historical context. Viewing the provisions of article I, section 31 from this perspective, it is clear the voters intended to adopt the original construction of the Civil Rights Act and prohibit the kind of preferential treatment accorded by this program.
Factual and Procedural Background
The salient facts, which are not in dispute, are drawn from the opinion of the Court of Appeal. In 1983, the City of San Jose (City) established a program to encourage public works projects participation by minority business enterprises (MBE’s) and women business enterprises (WBE’s).[1] For each contract, the City set a “participation goal” based on the “availability and ability of the MBE and WBE to do the work to be contracted.” To qualify as a “responsible bidder,” a contractor had to meet or exceed this goal or demonstrate “reasonable efforts” to obtain MBE/WBE participation. “Reasonable efforts” entailed documenting written notice to at least four MBE’s/WBE’s soliciting them for the project, follow-up contact to determine their interest in bidding, and written reasons justifying rejection of an MBE’s or WBE’s low bid.
In 1989, the United States Supreme Court held in Richmond v. J. A. Croson Co. (1989) 488 U.S. 469, 498-507 [109 S.Ct. 706, 724-729, 102 L.Ed.2d 854] (Croson), that a state government could not implement a program designed to remedy past discrimination absent a factual predicate substantiating an inference of prior discriminatory exclusion. Following Croson, in 1990 the City suspended its MBE/WBE program and commissioned a study to identify any statistically significant disparity in the number and dollar value of contracts and subcontracts awarded to MBE’s and WBE’s. The resulting report established such a disparity as to the amount of contract dollars awarded MBE subcontractors. In response, the City adopted the “MBE/WBE Construction Program” to encourage nondiscriminatory subcontracting. Like its predecessor, the new program included participation goals and required documentation of good faith efforts to meet them.
After the passage of Proposition 209, the City’s Office of Affirmative Action/Contract Compliance became the Office of Equality Assurance. The *543 City also adopted the Nondiscrimmation/Nonpreferential Treatment Program Applicable to Construction Contracts in Excess of $50,000 (Program) at issue here. The Program reaffirms the findings of the 1990 disparity study and attempts to clarify the City’s policy of nondiscrimination and nonpreference in the subcontracting of its construction projects to “ensure that the historical discrimination does not continue.”[2]
As with the 1983 version, the Program requires contractors bidding on City projects to fulfill either an outreach or a participation component. The “Documentation of Outreach” option entails maintaining records of written notice, or “solicitation letters,” to four certified MBE’s/WBE’s for each trade area identified for the project. Copies of the notice or letters must accompany the bid. The contractor must document at least three attempts to contact the MBE/WBE firms to determine their interest in participating in the project. If any MBE’s/WBE’s express interest, the contractor must negotiate in good faith. It may not unjustifiably reject any bids prepared by MBE’s/WBE’s and must specify the reasons for doing so.[3] With respect to the “Documentation of Participation” option, the City determines for each project the number of MBE/WBE subcontractors that would be expected in the absence of discrimination. If a contractor lists a sufficient number of MBE’s/WBE’s in the bid to meet this “evidentiary presumption” of nondiscrimination, it will satisfy the participation alternative, and the City will not require any documentation of outreach.
A bid failing to document either MBE/WBE outreach or participation is rejected as “nonresponsive,” and the contractor is deemed not a “responsible” bidder. The Program’s requirements apply to all contractors, including MBE’s, WBE’s, and those not planning to subcontract any portion of the project.
In 1997, the City solicited bids on a project for which plaintiff Hi-Voltage Wire Works, Inc. (Hi-Voltage), a general contracting firm, was the low bidder. Because it intended to utilize entirely its own work force, it failed to comply with either the MBE/WBE outreach or participation requirement. The City therefore rejected its bid. Joined by plaintiff Allen Jones, a City taxpayer, Hi-Voltage initiated this litigation challenging the Program as a *544 violation of article I, section 31 of the California Constitution (section 31) because it required contractors to accord “unlawful preferences” to minority and women subcontractors by giving them “special assistance and information” not provided non-MBE/WBE subcontractors. Plaintiffs sought declaratory relief and an injunction preventing continuation of the Program. The trial court granted plaintiffs’ motion for summary judgment, finding that both components of the Program constituted race- and sex-based classifications that violated section 31.
The Court of Appeal affirmed. Considering the language of section 31 in light of the ballot materials accompanying Proposition 209, the court concluded “that the term ‘preferential treatment’ . . . , viewed in its ordinary, natural sense, refers to any kind of treatment favoring one group or individual over another. The prohibition is not limited to set-asides, quotas, and ‘plus factors,’ but extends to all preferences granted to the target groups. [Fn. omitted.]” The court found section 31, as thus defined, invalidated the Program’s MBE/WBE outreach option because it does more than “encourag[e] contractors to include MBE/WBE’s in soliciting subcontractor bids.” It requires them “to give personal attention to and consideration of minority and women businesses that need not be given to non-MBE/WBE’s. Furthermore, the contractor may not ‘unjustifiably reject as unsatisfactory bids prepared by any [MBE’s/WBE’s].’ This requirement alone grants a distinct preference to MBE/WBE businesses.”
With respect to the participation option, the court determined the evidentiary presumption established an impermissible goal for including MBE/ WBE firms in a contractor’s bid. It found unpersuasive the City’s contention that the evidentiary presumption is not discriminatory or preferential because its purpose is “only to ‘screen’ for discrimination, ‘not to have contractors achieve some predetermined objective’ . . . .” In the court’s view, “[n]either the text of Proposition 209 nor its accompanying ballot materials suggest that a violation occurs only when the government intentionally discriminates or grants preferences.”
We granted the City’s petition for review to settle this important question of state constitutional law. To properly measure the relevant analytical context, we trace back almost 150 years before the passage of Proposition 209 and find recurring patterns in the law as to the appropriate role of government concerning questions of race.[4] This extended perspective both illuminates the meaning and purpose of Proposition 209 and guides its application.
*545 Discussion
I
A
The United States was founded on the principle that “all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are life, liberty, and the pursuit of happiness.” (Declaration of Independence.) Yet, our history reflects a continuing struggle to enable every individual to fully realize this “self-evident” article of faith. (See University of California Regents v. Bakke (1978) 438 U.S. 265, 387-395 [98 S.Ct. 2733, 2797-2802, 57 L.Ed.2d 750] (conc. & dis. opn. of Marshall, J.) (Bakke II).) That struggle demarcates the historical and cultural context within which we decide the issue before us.
While the courts have been instrumental in effecting positive change in the quest for equality, their involvement in articulating a coherent vision of the civil rights guaranteed by our Constitution has not been without its low points. (See McCleskey v. Kemp (1987) 481 U.S. 279, 343-344 [107 S.Ct. 1756, 1793-1794, 95 L.Ed.2d 262] (dis. opn. of Brennan, J.); Fullilove v. Klutznick, supra, 448 U.S. at p. 516 [100 S.Ct. at p. 2794] (conc. opn. of Powell, J.).) The nadir was perhaps the Dred Scott decision, in which the United States Supreme Court denied citizen status to African-Americans, “whether emancipated or not.” (Dred Scott v. Sandford (1856) 60 U.S. (19 How.) 393, 405 [15 L.Ed. 691, 700] (Dred Scott).) The true vice of Dred Scott lies not so much in the fact it “treated prohibition of slavery in the Territories as nothing less than a general assault on the concept of property.” (Washington v. Glucksberg (1997) 521 U.S. 702, 770 [117 S.Ct. 2258, 2284, 134 L.Ed.2d 772] (conc. opn. of Souter, J.); see Dred Scott, supra, 60 U.S. at *546 pp. 449-452 [15 L.Ed. at pp. 719-720].) Rather, a majority of the United States Supreme Court endorsed the then-prevailing societal view that African-Americans—whether slave or free—were “altogether unfit to associate with the white race, either in social or political relations”; and “had no rights which the white man was bound to respect.” (Dred Scott, supra, 60 U.S. at p. 407 [15 L.Ed. at p. 701]; cf. People v. Hall (1854) 4 Cal. 399, 404-405 [holding as a matter of “public policy” under state statute that Chinese, “a race of people whom nature has marked as inferior,” were precluded from testifying against White persons].) In legitimating this pernicious concept, the court set the stage not only for the cataclysm of the Civil War but for the contentiousness that continues to this day over government’s proper role with respect to race.
Following the Civil War, Congress overturned the Dred Scott decision when it adopted the Fourteenth Amendment expressly defining citizenship and forbidding any state from “deny[ing] to any person within its jurisdiction the equal protection of the laws.” Nevertheless, in Plessy v. Ferguson (1896) 163 U.S. 537, 552 [16 S.Ct. 1138, 1143-1144, 41 L.Ed. 256] (Plessy), the Supreme Court validated government-initiated racial restrictions and gave its imprimatur to legally enforced segregation on the theory that “[i]f one race be inferior to the other socially, the Constitution of the United States cannot put them upon the same plane.” The court approved “separate but equal” (ibid. (dis. opn. of Harlan, J.)) accommodations as a valid exercise of the state’s “police power” to prevent racial strife. (Id. at p. 544 [16 S.Ct. at pp. 1144-1145].) Although speaking only for himself at the time, Justice Harlan vigorously dissented: “Our Constitution is color-blind, and neither knows nor tolerates classes among citizens.” (Id. at p. 559 [16 S.Ct. at p. 1146] (dis. opn. of Harlan, J.).) “The destinies of the two races, in this country, are indissolubly linked together, and the interests of both require that the common government of all shall not permit the seeds of race hate to be planted under the sanction of law.” (Id. at p. 560 [16 S.Ct. at p. 1147] (dis. opn. of Harlan, J.).)
Justice Harlan’s view would not prevail for more than half a century. But, in Brown v. Board of Education (1954) 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180], a unanimous Supreme Court acknowledged the invidious effect of separating individuals solely because of their race. “ ‘The impact is greater when it has the sanction of the law . . . .’” (Id. at p. 494 [74 S.Ct. at p. 691].) Repudiating Plessy, the court concluded that “in the field of public education the doctrine of ‘separate but equal’ has no place. Separate educational facilities are inherently unequal [and] deprive[] [those affected] of the equal protection of the laws guaranteed by the Fourteenth Amendment.” (Id. at p. 495 [74 S.Ct. at p. 692].)
*547 Brown v. Board of Education, supra, 347 U.S. 483, concerned state-imposed segregation in education, but the courts did not hesitate to apply its animating principle in other contexts. (See Van Alstyne, Rites of Passage: Race, the Supreme Court, and the Constitution (1979) 46 U. Chi. L.Rev. 775, 783, fn. 24, and cases cited therein (Van Alstyne).) In summarizing the common thread of these cases, Professor Van Alstyne observed that in the years between 1955 and 1976 following Brown v. Board of Education, supra, 347 U.S. 483, “virtually every other race-related decision by the Supreme Court appeared to convey” Justice Harlan’s conviction “that the Civil War amendments altogether ‘removed the race line from our governmental systems.’ ” (Van Alstyne, supra, 46 U. Chi. L.Rev. at p. 783.) “To the reasonably discerning, this appeared true even in instances involving highly controversial judicial decrees that paired racially identifiable schools, redrafted attendance lines, or mandated busing. In each instance, the fulcrum of judicial leverage was an existing governmental race line, which the particular judicial order sought to remove. The object was thus to disestablish particular, existing uses of race, not to establish new ones.” (Id. at pp. 783-784, fn. omitted.)
Although a landmark decision, Brown v. Board of Education was not singular. Both before and after, the United States Supreme Court was actively developing a “color-blind” jurisprudence. Hughes v. Superior Court (1950) 339 U.S. 460 [70 S.Ct. 718, 94 L.Ed. 985] involved an injunction against picketers seeking to have a supermarket hire African-American grocery clerks at a particular location proportionate to the number of African-American customers at that store. This court upheld a judgment of contempt for violation of the injunction, and the high court affirmed. The picketers had claimed a deprivation of due process for infringement of their right to free speech. The Supreme Court rejected the argument, noting “that it would encourage discriminatory hiring to give constitutional protection to petitioners’ efforts to subject the opportunity of getting a job to a quota system.” (Id. at p. 463 [70 S.Ct. at p. 720]; cf. DeFunis v. Odegaard, supra, 416 U.S. at p. 336 [94 S.Ct. at p. 1716] (dis. opn. of Douglas, J.) [“There is no constitutional right for any race to be preferred”].)
In Peterson v. Greenville (1963) 373 U.S. 244 [83 S.Ct. 119, 10 L.Ed.2d 323], the high court struck down a city ordinance requiring restaurant and hotel proprietors to maintain segregated facilities. When a state “passes a law compelling persons to discriminate against other persons because of race,” it commits “a palpable violation of the Fourteenth Amendment . . . .” (Id. at p. 248 [83 S.Ct. at p. 1121].) Reitman v. Mulkey (1967) 387 U.S. 369 [87 S.Ct. 1627, 18 L.Ed.2d 830] concerned a state constitutional *548 amendment that, while facially neutral, encouraged and facilitated racial discrimination in the rental and sale of residential property. As in analogous decisions, the state had violated the right of equal protection because it “had taken affirmative action designed to make private discriminations legally possible.” (Id. at p. 375 [87 S.Ct. at p. 1631].)[5]
Professor Alexander Bickel referred to these cases as “the great decisions of the Supreme Court” whose lesson “and the lesson of contemporary history have been the same for at least a generation: discrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society.” (Bickel, The Morality of Consent (1975) p. 133 (Bickel).) For Professor Van Alstyne, “the message is commendably even stronger. Laws that divide and index people to measure their civil rights by race are unconstitutional. Laws that encourage others to do so are similarly invalid. And laws attempting to advance either policy even in disguise will likewise be struck down whenever it is within the capacity of conscientious courts to see beneath their cellophane wrappers.” (Van Alstyne, supra, 46 U. Chi. L.Rev. at p. 792, fn. omitted.)
B
Although the United States Supreme Court had rejected the principle of separate but equal and had directed the admission of students to public schools “on a racially nondiscriminatory basis with all deliberate speed” (Brown v. Board of Education (1955) 349 U.S. 294, 301 [75 S.Ct. 753, 757, 99 L.Ed. 1083]), many officials charged with implementing the mandate were reluctant if not recalcitrant. Discrimination remained the norm generally, prompting protests and acts of civil disobedience. (See, e.g., Peterson v. Greenville, supra, 373 U.S. 244.) In response, Congress enacted the Civil *549 Rights Act of 1964 (Civil Rights Act or Act). As the floor debates and committee reports attest, Congress intended that the Act reflect Justice Harlan’s understanding of the Constitution and “be ‘colorblind’ in its application.” (Bakke II, supra, 438 U.S. at p. 415 [98 S.Ct. at p. 2812], fn. omitted (conc. & dis. opn. of Stevens, J.); see Steelworkers v. Weber (1979) 443 U.S. 193, 229-252 [99 S.Ct. 2721, 2740-2752, 61 L.Ed.2d 480] (dis. opn. of Rehnquist, J.) [detailing legislative history of title VII of the Act].)
Title VII of the Civil Rights Act (Title VII) forbids, with limited exceptions, discrimination in employment on the basis of race, color, religion, sex, or national origin.[6] Because section 31 closely parallels this provision in both language and purpose, the next phase in developing our historical context concerns the analytical and philosophical evolution in the interpretation and application of Title VII.
The Supreme Court first considered an alleged violation of Title VII in Griggs v. Duke Power Co. (1971) 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158] (Griggs). African-American workers claimed a racially neutral hiring and promotion criterion unrelated to any job requirement discriminated against them in its actual effect. In a unanimous opinion by Chief Justice Burger, the high court agreed: “The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities . . . .” (Id. at p. 429 [91 S.Ct. at p. 853]; see also Teamsters v. United States (1977) 431 U.S. 324, 335, fn. 15 [97 S.Ct. 1843, 1854, 52 L.Ed.2d 396] (Teamsters).) To that end, the Act prohibited “not only overt discrimination but also practices that are fair in form, but discriminatory in operation.” (Griggs, supra, 401 U.S. at p. 431 [91 S.Ct. at p. 853].) Nevertheless, the court stressed, “Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. . . . Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate *550 on the basis of racial or other impermissible classification.” (Id. at pp. 430-431 [91 S.Ct. at p. 853].)
Equally clear in the court’s view, “Title VII . . . prohibits the discharge of ‘any individual’ because of ‘such individual’s race,’ [citation]. Its terms are not limited to discrimination against members of any particular race.” (McDonald v. Santa Fe Trail Transp. Co. (1976) 427 U.S. 273, 278-279 [96 S.Ct. 2574, 2578, 49 L.Ed.2d 493], fn. omitted (McDonald); see ante, at p. 549, fn. 6.) “This conclusion is in accord with uncontradicted legislative history to the effect that Title VII was intended to ‘cover white men and white women and all Americans,’ [citation], and create an ‘obligation not to discriminate against whites,’ [citation].” (McDonald, at p. 280 [96 S.Ct. at p. 2579].) Accordingly, regardless of the complainant’s race, the “same standards” prohibiting employment discrimination applied. (Ibid.)[7]
Regarding appropriate relief for Title VII violations, the court reaffirmed in Teamsters, supra, 431 U.S. 324, that “[a]n equally important purpose of the Act is ‘to make persons whole for injuries suffered on account of unlawful employment discrimination.’ [Citation.] In determining the specific remedies to be afforded, a district court is ‘to fashion such relief as the particular circumstances of a case may require to effect restitution.’ [Citation.]” (Id. at p. 364 [97 S.Ct. at p. 1869].) Consistent with the broad equitable powers conferred by Congress, Title VII courts may even, under limited circumstances, award seniority to persons who had never actually applied for a job. “A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.” (Teamsters, at p. 365 [97 S.Ct. at p. 1870].) Such a violation may not be unduly attenuated, however. The claimant must “show that he was a potential victim of unlawful discrimination” and discharge “the not always easy burden of proving that he would have applied for the job had it not been for those practices. [Citation.]” (Id. at pp. 367-368 [97 S.Ct. at p. 1871].)
The court cautioned, however, that “Title VII. . . does not impose a duty to adopt a hiring procedure that maximizes hiring of minority employees.” *551 (Furnco Construction Corp. v. Waters (1978) 438 U.S. 567, 577-578 [98 S.Ct. 2943, 2949-2950, 57 L.Ed.2d 957] (Furnco).) “It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for each applicant regardless of race, without regard to whether members of the applicant’s race are already proportionately represented in the work force. [Citations.]” (Id. at p. 579 [98 S.Ct. at p. 2951].) Thus, “courts may not impose such a remedy on an employer at least until a violation of Title VII has been proved . . . .” (Id. at p. 578 [98 S.Ct. at p. 2950].)
The Supreme Court’s early interpretation of Title VII emphasized several factors: The purpose of Title VII was to ensure equal opportunity for all. Thus, discriminatory practices were forbidden irrespective of the victim’s race. Relief could take the form of restitution to individual victims, including those establishing that an employer’s pattern and practice of discrimination deterred their applications for employment. It could also be remedial, to eradicate the effects of specific discriminatory practices, but courts had no obligation or authority to require any particular affirmative hiring or other employment practices. In other words, consistent with congressional intent, the court’s construction confirmed and reinforced the role of government as color-blind in these matters.
C
The analytical framework of Title VII jurisprudence underwent substantial modification in 1979 when the United States Supreme Court decided Steelworkers v. Weber, supra, 443 U.S. 193 (Weber). In Weber, the employer voluntarily instituted a training program as part of an effort to eliminate a conspicuous racial imbalance in its craftworkers. Selection for the program was based on seniority, with the proviso that at least half of the trainees chosen be African-Americans “until the percentage of black skilled craft-workers in the . . . plant approximated the percentage of blacks in the local labor force.” (Id. at p. 199 [99 S.Ct. at p. 2725].) A White employee who had been denied entry despite greater seniority than some African-Americans admitted into the program brought suit under Title VII. A majority of the court found no violation. “Examination of [the legislative history of Title VII and the historical context from which the Act arose] makes clear that an interpretation . . . that forbade all race-conscious affirmative action would ‘bring about an end completely at variance with the purpose of the statute’ and must be rejected. [Citations.]” (Weber, at pp. 201-202 [99 S.Ct. at p. 2726].) Because “Congress’ primary concern in enacting the prohibition against racial discrimination in Title VII of the Civil Rights Act of 1964 was with ‘the plight of the Negro in our economy’ ” (Weber, at p. 202 [99 S.Ct. *552 at pp. 2726-2727]) and “private and voluntary affirmative action efforts [were] one method of solving this problem” (id. at p. 203 [99 S.Ct. at p. 2727]), Congress could not have meant to ban them absolutely. (Id. at p. 206 [99 S.Ct. at pp. 2728-2729].) The court further interpreted Title VII to permit race-conscious action “whenever the job category in question is ‘traditionally segregated.’ [Citation.]” (Weber, at p. 212 [99 S.Ct. at p. 2731] (conc. opn. of Blackmun, J.).)
Although concurring, Justice Blackmun admitted, “The Court’s expansive approach is somewhat disturbing for me because, as Mr. Justice Rehnquist points out, the Congress that passed Title VII probably thought it was adopting a principle of nondiscrimination that would apply to blacks and whites alike. While setting aside that principle can be justified where necessary to advance statutory policy by encouraging reasonable responses as a form of voluntary compliance that mitigates ‘arguable violations,’ discarding the principle of nondiscrimination where no countervailing statutory policy exists appears to be at odds with the bargain struck when Title VII was enacted.” (Weber, supra, 443 U.S. 193, 212-213 [99 S.Ct. 2721, 2732] (conc. opn. of Blackmun, J.).) Justice Blackmun also expressed concern that under the majority’s rule, “[t]he individual employer need not have engaged in discriminatory practices in the past.” (Id. at p. 213 [99 S.Ct. at p. 2732].) Nevertheless, he discerned some analytical support for the result and concluded that “if the Court has misperceived the political will, it has the assurance that because the question is statutory Congress may set a different course if it so chooses.” (Id. at p. 216 [99 S.Ct. at p. 2734]; but see DeRonde v. Regents of University of California (1981) 28 Cal.3d 875, 902, fn. 6 [172 Cal.Rptr. 677, 625 P.2d 220] (dis. opn. of Mosk, J.) (DeRonde); Johnson v. Transportation Agency (1987) 480 U.S. 616, 671-672 [107 S.Ct. 1442, 1472-1473, 94 L.Ed.2d 615] (dis. opn. of Scalia, J.) (Johnson).)
Chief Justice Burger and then-Justice Rehnquist dissented. The Chief Justice criticized the majority’s apparent reversal of settled law: “Until today, I had thought the Court was of the unanimous view that ‘[d]iscriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed’ in Title VII.” (Weber, supra, 443 U.S. 193, 218 [99 S.Ct. 2721, 2735] (dis. opn. of Burger, C. J.), quoting Griggs, supra, 401 U.S. at p. 431 [91 S.Ct. at p. 853].) In his view, the legislative history established that the Civil Rights Act “was conceived and enacted to make discrimination against any individual illegal, and I fail to see how ‘voluntary compliance’ with the no-discrimination principle that is the heart and soul of Title VII as currently written will be achieved by permitting employers to discriminate against some individuals to give preferential treatment to others.” (Weber, at p. 218 [99 S.Ct. at p. 2735].)
*553 Justice Rehnquist recounted the numerous cases in which the court had “never wavered in our understanding that Title VII ‘prohibits all racial discrimination in employment, without exception for any group of particular employees.’ [Citation.]” (Weber, supra, 443 U.S. 193, 220 [99 S.Ct. 2721, 2736] (dis. opn. of Rehnquist, J.), quoting McDonald, supra, 427 U.S. at p. 283 [96 S.Ct. at p. 2580].) He also exhaustively analyzed extensive portions of Title VII’s legislative history supporting that understanding. (Weber, at pp. 226-254 [99 S.Ct. at pp. 2739-2753].) For example, “Senator Humphrey [one of the bipartisan floor managers of the entire civil rights bill in the Senate] . . . stated that ‘nothing in the bill would permit any official or court to require any employer or labor union to give preferential treatment to any minority group.’ [Citation.]” (Id. at p. 237 [99 S.Ct. at p. 2744], fn. omitted.)[8] Senator Kuchel, the other bipartisan floor manager explained: “ ‘Employers and labor organizations could not discriminate in favor of or against a person because of his race, his religion, or his national origin. In such matters ... the bill now before us ... is color-blind.’ [Citation.]” (Weber, at p. 238 [99 S.Ct. at p. 2745].) As its proponents emphasized, the Act “ ‘provides no preferential treatment for any group of citizens. In fact, it specifically prohibits such treatment.’ [Citation.]” (Id. at p. 248 [99 S.Ct. at p. 2750], fn. omitted.)
In the wake of Weber, Title VII jurisprudence underwent a sea change in less than a decade (see Johnson, supra, 480 U.S. 616, 642-643 [107 S.Ct. 1442, 1457-1458] (conc. opn. of Stevens, J.)), from providing individualized restitutionary relief for specific injury to approving race-conscious practices by court order or employer-initiated programs.[9] (Compare, e.g., Teamsters, supra, 431 U.S. at pp. 342-343, fn. 24, 346-347, 356-362, 374-375, fn. 61 *554 [97 S.Ct. at pp. 1858, 1860-1861, 1865-1868, 1874], with, e.g., Sheet Metal Workers v. EEOC (1986) 478 U.S. 421, 445 [106 S.Ct. 3019, 3034, 92 L.Ed.2d 344] (Sheet Metal Workers).) Having once validated consideration of race, the United States Supreme Court struggled to articulate a principled, consistent standard for doing so given its earlier construction of Title VII. (See also Adarand, supra, 515 U.S. at pp. 212-231 [115 S.Ct. at pp. 2105-2115] [reflecting similar difficulty developing coherent principles for consistently resolving equal protection challenges to race-based actions].)
For example, in Sheet Metal Workers, supra, 478 U.S. at page 445 [106 S.Ct. at page 3034], the court determined—over contrary arguments by the Equal Employment Opportunity Commission—that Title VII “does not prohibit a court from ordering, in appropriate circumstances, affirmative race-conscious relief [in the form of fixed union membership goals] as a remedy for past discrimination” even if it may benefit individuals who were not identified victims of such discrimination. (See also Firefighters v. Cleveland (1986) 478 U.S. 501 [106 S.Ct. 3063, 92 L.Ed.2d 405] [consent decree requiring race-conscious promotions did not violate Title VII even though beneficiaries had not suffered discrimination].) In reaching this result, a plurality of the court construed Title VII not only to guarantee equal employment opportunities but to “foster” them as well. (Sheet Metal Workers, supra, 478 U.S. at p. 448 [106 S.Ct. at pp. 3035-3036].) “[E]ven where the employer or union formally ceases to engage in discrimination, informal mechanisms may obstruct equal employment opportunities. An employer’s reputation for discrimination may discourage minorities from seeking available employment. [Citations.] In these circumstances, affirmative race-conscious relief may be the only means available ‘to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens.’ [Citations.]” (Id. at pp. 449-450 [106 *555 S.Ct. at p. 3036].) As Justice O’Connor observed, however, “[t]he plurality offers little guidance as to what separates an impermissible quota from a permissible goal.” (Id. at p. 494 [106 S.Ct. at p. 3059] (conc. & dis. opn. of O’Connor, J.).)
A year later, in Johnson, supra, 480 U.S. 616, the Supreme Court validated a public agency’s plan, whereby it promoted a woman over a male who ranked higher on the promotional test. Notwithstanding the lack of any evidence the agency had actually discriminated against women, the court found the plan justified by a “ ‘conspicuous . . . imbalance in traditionally segregated job categories.’ [Citation.]” (Id. at p. 630 [107 S.Ct. at p. 1451].) Departing from the burden-shifting procedures of McDonnell Douglas, supra, 411 U.S. 792, and Furnco, supra, 438 U.S. 567 (see ante, at p. 550, fn. 7), the court concluded “[a] manifest imbalance need not be such that it would support a prima facie case against the employer . . . since we do not regard as identical the constraints of Title VII and the Federal Constitution on voluntarily adopted affirmative action plans.” (Johnson, supra, 480 U.S. at p. 632 [107 S.Ct. at p. 1452], fn. omitted; see also id. at p. 633, fn. 10 [107 S.Ct. at p. 1452].) Accordingly, the agency “appropriately took into account . . . sex” in making its promotional decision. (Id. at p. 641 [107 S.Ct. at p. 1457].)
The court in Johnson approved preferential treatment of a woman because “the decision to hire [her] was made pursuant to an Agency plan that directed that sex or race be taken into account for the purpose of remedying underrepresentation.” (Johnson, supra, 480 U.S. at p. 634 [107 S.Ct. at p. 1453].) In relying on this justification, it replaced individual right of equal opportunity with proportional group representation. Although pursued for the purpose of eliminating invidious discrimination, history reveals that this prevailing social and political norm had its parallel in laws antedating the Civil Rights Act, when government could legally classify according to race. (See Van Alstyne, supra, 46 U.Chi. L.Rev. at pp. 797-803.)
D
Our own decisional law has mirrored this change in focus from protection of equal opportunity for all individuals to entitlement based on group representation. During the period the United States Supreme Court was issuing its great decisions, California was not without its own “judicial harbingers of a prejudice-free society” (DeRonde, supra, 28 Cal.3d 875, 893 (dis. opn. of Mosk, J.)), opinions in which “this court had consistently maintained that race or similar characteristics are not a qualification or *556 disqualification for the benefits of society.” (Id. at p. 892.) In Perez v. Sharp (1948) 32 Cal.2d 711 [198 P.2d 17], we struck down the state’s antimiscegenation statute as inimical to civilized society. In James v. Marinship Corp. (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900], the court affirmed an order that a union admit African-Americans so they could continue to work for an employer with which the union had a closed shop agreement. “Where, as here, a labor union has attained a monopoly of the labor supply through closed shop agreements, such a union, like a public service business, may not unreasonably discriminate against Negro workers for the sole reason that they are colored persons.” (Id. at p. 740.)
Hughes v. Superior Court (1948) 32 Cal.2d 850 [198 P.2d 885] (the decision reviewed in Hughes v. Superior Court, supra, 339 U.S. 460) upheld a judgment of contempt against picketers who had the “unlawful objective” “not to induce [an employer] not to discriminate against, but, rather, expressly to compel [it] to discriminate arbitrarily in favor of, one race as against all others in the hiring of a portion of its clerks . . . .” (Hughes v. Superior Court, supra, 32 Cal.2d at p. 854.) In words that presaged the Civil Rights Act debates, the court condemned the picketers’ objective, which “would, to the extent of the fixed proportion, make the right to work for [the employer] dependent not on fitness for the work nor on an equal right of all, regardless of race, to compete in an open market, but, rather, on membership in a particular race. If petitioners were upheld in their demand then other races, white, yellow, brown and red, would have equal rights to demand discriminatory hiring on a racial basis.” (Hughes, at p. 856.)
In Mulkey v. Reitman (1966) 64 Cal.2d 529 [50 Cal.Rptr. 881, 413 P.2d 825] (the decision reviewed in Reitman v. Mulkey, supra, 387 U.S. 369), the court invalidated a constitutional initiative that guaranteed owners the right to discriminate in the rental or sale of their property. “ ‘For a State to place its authority behind discriminatory treatment based solely on color is indubitably a denial by a State of equal protection of the laws, in violation of the Fourteenth Amendment.’ ” (Mulkey v. Reitman, supra, 64 Cal.2d at p. 541.) “Here the state has affirmatively acted to change its existing laws from a situation wherein the discrimination practiced was legally restricted to one wherein it is [impermissibly] encouraged . . . .” (Id. at p. 542.)
Finally, in Bakke v. Regents of University of California (1976) 18 Cal.3d 34 [132 Cal.Rptr. 680, 553 P.2d 1152] (Bakke I), the plaintiff challenged a medical school admissions program that reserved 16 percent of the admission opportunities in each year’s class for minority students. The court did not hesitate to find a denial of equal protection. We acknowledged, “The *557 persuasiveness of these arguments [that preferential treatment of minorities is necessary to eliminate the lingering effects of past discrimination] cannot be denied, for the ends sought by such programs are clearly just if the benefit to minorities is viewed in isolation. But there are more forceful policy reasons against preferential admissions based on race. The divisive effect of such preferences needs no explication and raises serious doubts whether the advantages obtained by the few preferred are worth the inevitable cost to racial harmony. . . . Perhaps most important, the principle that the Constitution sanctions racial discrimination against a race—any race—is a dangerous concept fraught with potential for misuse in situations which involve far less laudable objectives than are manifest in the present case.” (Id. at pp. 61-62, fn. omitted.)[10]
Following Weber, however, this court in Price v. Civil Service Com. (1980) 26 Cal.3d 257 [161 Cal.Rptr. 475, 604 P.2d 1365] (Price), declined to reaffirm its categorical hostility toward racial classifications and approved a race-conscious hiring program that required the appointment of minority applicants on a preferential basis until the appointing agency attained a certain percentage of minority employees. (See id. at p. 266.) Because the program was remedial and intended “to overcome the continuing effects of past discrimination” (id. at p. 270) as well as “bring[] about the full participation of minority individuals in our society” (id. at p. 286), a majority found it did not violate Title VII or California’s Fair Employment Practices Act (FEPA). (Price, at pp. 270-277.) “[T]he Weber court held that title VIPs prohibition against racial discrimination does not mandate a ‘color-blind’ approach to all employment remedies and does not compel an employer to eschew race-conscious affirmative action programs under all circumstances.” (Id. at p. 273, fn. omitted.) Since FEPA “arose out of the same historical context as the federal Civil Rights Act,” “those provisions should similarly ... be interpreted . . . ,”[11] (Price, at p. 276; see also Minnick v. Department of Corrections, supra, 95 Cal.App.3d at pp. 523-524.)
*558 Dissenting, Justice Mosk characterized the majority’s reasoning as “ ‘doublethink’ ": “[They] . . . purport to eliminate discrimination by means of creating discrimination; they construe equality of all persons regardless of race to mean preference for persons of some races over others; and a hiring program which compels compliance by a reluctant [county agency] is described as voluntary.” (Price, supra, 26 Cal.3d 257, 286-287 (dis. opn. of Mosk, J.).) “It is now clear that undergirding much of the rhetoric supporting racial quotas, and preferential treatment in general, is a view of justice that demands not that the state treat its citizens without reference to their race, but that it rearrange and index them precisely on the basis of their race. The objective is not equal treatment but equal representation.” (Id. at pp. 290-291.)
One year later in DeRonde, supra, 28 Cal.3d 875, the court rejected an equal protection challenge to racial preferences accorded in a law school admissions program. “Having held in Price, wherein an express quota was applied, that the state Constitution places no greater restrictions on affirmative action programs encouraging increased minority representation than are imposed by the federal Constitution, a fortiori, under principles of stare decisis, we impose no state constitutional bar where the program involves no fixed quota but only consideration of race as one among several other qualifying factors.” (Id. at p. 890.) As in Price, Justice Mosk challenged the majority’s premise: “The majority, armed in adamant, insist upon turning the calendar back several decades. They have chosen to revive the indefensible practices of pre-Brown days [citation] when skin pigmentation and ethnicity were the qualifications that determined a child’s school. They have rejected the plea of Justice Harlan . . . for a colorblind America . . . .” (DeRonde, supra, 28 Cal.3d 875, 891-892 (dis. opn. of Mosk, J.).)
As with decisions of the United States Supreme Court, we thus find a fundamental shift from a staunch antidiscrimination jurisprudence to approval, sometimes endorsement, of remedial race- and sex-conscious governmental decisionmaking. (See also Price, supra, 26 Cal.3d 257, 287-289 (dis. opn. of Mosk, J.); Estes v. Metropolitan Branches of Dallas NAACP (1980) 444 U.S. 437, 450 [100 S.Ct. 716, 723, 62 L.Ed.2d 626] (Powell, J., dis. from dism. of cert.); Bickel, supra, at p. 133; Van Alstyne, supra, 46 U.Chi. L.Rev. at p. 809; Bunzel, Affirmative Action, Negative Results (Nov. 1979) Encounter, 43, 51.)
*559 II
From Johnson and DeRonde, we move forward a decade to the November 5, 1996 General Election and voter approval of Proposition 209, which added section 31 to article I of the California Constitution. Section 31, subdivision (a), provides: “The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.”[12] The question is: Does the City’s Program contravene this injunction?
A
“A constitutional amendment should be construed in accordance with the natural and ordinary meaning of its words. [Citation.]” (Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281] (Amador Valley); People ex rel. Lungren v. Superior Court (1997) 14 Cal.4th 294, 302 [58 Cal.Rptr.2d 855, 926 P.2d 1042].) Nothing in the ballot arguments or in the Legislative Analyst’s analysis suggests that a different rule should apply with respect to “discriminate” and “preferential treatment” as used in section 31, or that the voters intended them to have any specialized meaning. (See also Kidd v. State of California (1998) 62 Cal.App.4th 386, 407 [72 Cal.Rptr.2d 758]; Lungren v. Superior Court (1996) 48 Cal.App.4th 435, 441 [55 Cal.Rptr.2d 690] (Lungren).) “[D]iscriminate” means “to make distinctions in treatment; show partiality (in favor of) or prejudice (against)” *560 (Webster’s New World Diet. (3d college ed. 1988) p. 392); “preferential” means giving “preference,” which is “a giving of priority or advantage to one person . . . over others.” (Id. at p. 1062.)[13] Interpreting section 31 accordingly, we conclude, as did the Court of Appeal, that the City’s Program is unconstitutional because the outreach option affords preferential treatment to MBE/WBE subcontractors on the basis of race[14] or sex, and the participation option discriminates on the same bases against non-MBE/WBE subcontractors as well as general contractors that fail to fulfill either of the options when submitting their bids.
While the language of Proposition 209 is clear, and literally interpreted does not lead to absurd results (see Amador Valley, supra, 22 Cal.3d at p. 245), we may “test our construction against those extrinsic aids that bear on the enactors’ intent” (Powers v. City of Richmond (1995) 10 Cal.4th 85, 93 [40 Cal.Rptr.2d 839, 893 P.2d 1160]), in particular the ballot materials accompanying Proposition 209 that place the initiative in historical context. (See Hodges v. Superior Court (1999) 21 Cal.4th 109, 114 [86 Cal.Rptr.2d 884, 980 P.2d 433]; Mulkey v. Reitman, supra, 64 Cal.2d at pp. 533-534; see also Amador Valley, at pp. 245-246.)
The argument in favor of Proposition 209 stated in part, “A generation ago, we did it right. We passed civil rights laws to prohibit discrimination. But special interests hijacked the civil rights movement. Instead of equality, governments imposed quotas, preferences, and set-asides. [¶] Proposition 209 is called the California Civil Rights Initiative because it restates the historic Civil Rights Act . . . . [¶] . . . [¶] . . . Real ‘affirmative action’ originally meant no discrimination and sought to provide opportunity.” (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) argument in favor of Prop. 209, p. 32 (Ballot Pamphlet).) “Anyone opposed to Proposition 209 is opposed to the 1964 Civil Rights Act.” (Id., rebuttal to argument against Prop. 209, p. 33.)
The initiative’s proponents further argued: “ ‘Reverse Discrimination’ Based on Race or Gender Is Plain Wrong! [¶] And two wrongs don’t make a right! . . . [¶] . . . Government should not discriminate. It must not *561 give a job, a university admission, or a contract based on race or sex. Government must judge all people equally, without discrimination! [¶] . . . [¶] Government cannot work against discrimination if government itself discriminates. . . . It’s time to bring us together under a single standard of equal treatment under the law. [¶] . . . [¶] We are individuals! Not every white person is advantaged. And not every ‘minority’ is disadvantaged. Real ‘affirmative action’ originally meant no discrimination and sought to provide opportunity. . . . [¶] The only honest and effective way to address inequality of opportunity is by making sure that dll California children are provided with the tools to compete in our society. And then let them succeed on a fair, color-blind, race-blind, gender-blind basis. [¶] Let’s not perpetuate the myth that ‘minorities’ and women cannot compete without special preference. Let’s instead move forward by returning to the fundamentals of our democracy: individual achievement, equal opportunity and zero tolerance for discrimination against—or for—any individual.” (Ballot Pamp., supra, argument in favor of Prop. 209, p. 32; see also id., Legis. Analyst’s analysis of Prop. 209, p. 30 [“[Current] law requires [state] departments ... to reject bids from companies that have not made sufficient ‘good faith efforts’ to meet [‘affirmative action’ contracting] goals.”].)
As the district court in Coalition I, supra, 946 F.Supp. at page 1489, correctly perceived from these arguments, “the people of California meant to do something more than simply restate existing law when they adopted Proposition 209.” In taking a measure of that “something more,” the “historic Civil Rights Act” referent tells us the voters intended to reinstitute the interpretation of the Civil Rights Act and equal protection that predated Weber, supra, 443 U.S. 193, and Bakke II, supra, 438 U.S. 265, as well as Price, supra, 26 Cal.3d 257, and DeRonde, supra, 28 Cal.3d 875, viz., an interpretation reflecting the philosophy that “[h]owever it is rationalized, a preference to any group constitutes inherent inequality. Moreover, preferences, for any purpose, are anathema to the very process of democracy.” (Price, supra, 26 Cal.3d 257, 299 (dis. opn. of Mosk, J.).)
By virtue of the initiative process, the California electorate “set a different course” from that charted by the courts since Weber and Price. (Weber, supra, 443 U.S. 193, 216 [99 S.Ct. 2721, 2733-2734] (conc. opn. of Black-mun, J.).) “Rather than classifying individuals by race or gender, Proposition 209 prohibits the State from classifying individuals by race or gender.” (Coalition for Economic Equality v. Wilson (9th Cir. 1997) 122 F.3d 692, 702 (Coalition II); see also Johnson, supra, 480 U.S. at p. 658 [107 S.Ct. at pp. 1465-1466] (dis. opn. of Scalia, J.).) The ballot arguments—from which we draw our historical perspective—make clear that in approving *562 Proposition 209, the voters intended section 31, like the Civil Rights Act as originally construed, “to achieve equality of [public employment, education, and contracting] opportunities” (Griggs, supra, 401 U.S. at p. 429 [91 S.Ct. at p. 853]) and to remove “barriers [that] operate invidiously to discriminate on the basis of racial or other impermissible classification.” (Id. at p. 431 [91 S.Ct. at p. 853].) In short, the electorate desired to restore the force of constitutional law to the principle articulated by President Carter on Law Day 1979: “ ‘Basing present discrimination on. past discrimination is obviously not right.’ ” ((May 15, 1979) 47 U.S.L. Week 2726.)
B
Considering the entirety of our discussion, we remain persuaded the City’s Program violates section 31. Because the City rejects any bid that fails to comply with one or the other requirement, both of which are race and sex based, the essential structure of the Program discriminates on an impermissible basis against prime contractors that neither engage in outreach nor meet the evidentiary presumption, and it grants preferential treatment to those that do. (See Monterey Mechanical Co. v. Wilson (9th Cir. 1997) 125 F.3d 702, 707, 710 (Monterey Mechanical); see also Coalition I, supra, 946 F.Supp. at pp. 1495-1496.)
The outreach component requires contractors to treat MBE/WBE subcontractors more advantageously by providing them notice of bidding opportunities, soliciting their participation, and negotiating for their services, none of which they must do for non-MBE’s/WBE’s. The fact prime contractors are not precluded from contacting non-MBE’ s/WBE’s is irrelevant. The relevant constitutional consideration is that they are compelled to contact MBE’s/WBE’s, which are thus accorded preferential treatment within the meaning of section 31. (See Monterey Mechanical, supra, 125 F.3d at p. 711; see also Furnco, supra, 438 U.S. at p. 577 [98 S.Ct. at p. 2949] [“The central focus of the inquiry ... is always whether the employer is treating ‘some people less favorably than others because of their race, color, religion, sex, or national origin’ [citation].”]; cf. Mulkey v. Reitman, supra, 64 Cal.2d at pp. 540, 542; Anderson v. Martin, supra, 375 U.S. at p. 403 [84 S.Ct. at p. 456]; Peterson v. Greenville, supra, 373 U.S. at p. 248 [83 S.Ct. at p. 1121].)
The participation component authorizes or encourages what amounts to discriminatory quotas or set-asides, or at least race- and sex-conscious numerical goals. (See Monterey Mechanical, supra, 125 F.3d at p. 711; Bras v. California Public Utilities Com’n (9th Cir. 1995) 59 F.3d 869, 875 (Bras); see generally Mulkey v. Reitman, supra, 64 Cal.2d at p. 541; Anderson v. *563 Martin, supra, 375 U.S. 399.) A participation goal differs from a quota or set-aside only in degree; by whatever label, it remains “a line drawn on the basis of race and ethnic status” as well as sex. (Bakke II, supra, 438 U.S. at p. 289 [98 S.Ct. at pp. 2747-2748], fn. omitted; see Bras, supra, 59 F.3d at pp. 874-875.) Thus understood, such a goal plainly runs counter to the express intent of the historic Civil Rights Act and, concomitantly, the intent of Proposition 209. As members of Congress were repeatedly assured regarding Title VII, the Act “ ‘provides no preferential treatment for any group of citizens. In fact, it specifically prohibits such treatment.’ [Citation.]” (Weber, supra, 443 U.S. at p. 248 [99 S.Ct. at p. 2750], some italics added (dis. opn. of Rehnquist, J.), quoting remarks of Sen. Saltonstall, Chair of the Republican Conf. of Sens. (110 Cong. Rec. 12691 (1964).). While perhaps less explicit in the Act itself, the same may be said for the race- and sex-conscious outreach at issue here, in that it effectively provides an advantage to members of the targeted groups. For example, in Furnco, supra, 438 U.S. 567, the Supreme Court rejected a requirement that an employer alter its race-neutral hiring practices and institute a method that allowed it “to consider the qualifications of the largest number of minority applicants.” (Id. at p. 576 [98 S.Ct. at p. 2949].) “We think the imposition of that . . . simply finds no support either in the nature of the prima facie case or the purpose of Title VII.” (Id. at pp. 576-577 [98 S.Ct. at p. 2949]; see id. at p. 578 [98 S.Ct. at p. 2950].)
The City’s Program essentially places on a contractor the burden of disproving a negative. Without any prima facie proof of past misconduct, a contractor must establish its responsibility as a bidder by showing it does not discriminate on an impermissible basis in its subcontracting. As with any requirement that utilizes preferences, this completely inverts the normal procedures for making discrimination claims. (See, e.g., Furnco, supra, 438 U.S. at pp. 577-578 [98 S.Ct. at pp. 2949-2950] [describing the burden-shifting procedure for complainants under Title VII]; cf. Croson, supra, 488 U.S. 469, 516 [109 S.Ct. 706, 733] (conc. opn. of Stevens, J.) [“[I]t is only habit, rather than evidence or analysis, that makes it seem acceptable to assume that every white contractor covered by the ordinance shares, in that guilt [of past discrimination]”]; Sheet Metal Workers, supra, 478 U.S. at p. 494 [106 S.Ct. at p. 3059] (conc. & dis. opn. of O’Connor, J.) [“it is completely unrealistic to assume that individuals of each race will gravitate with mathematical exactitude to each employer or union absent unlawful discrimination”].) Furthermore, a contractor may show nondiscrimination only in the manner designated by the City, either according to a fixed participation goal or by prescribed outreach to MBE’s and WBE’s. In other words, it can only prove it does not discriminate against minorities and *564 women by discriminating or granting preferences in their favor. (See Johnson, supra, 480 U.S. 616, 675-676 [107 S.Ct. 1442, 1474-1475] (dis. opn. of Scalia, J.); Bras, supra, 59 F.3d at p. 874.)
Contrary as well to the principles of the Civil Rights Act, listing a sufficient number of MBE/WBE subcontractors to meet the evidentiary presumption may potentially give cover to discrimination committed after a contractor has met the established goal. In Furnco, supra, 438 U.S. at page 579 [98 S.Ct. at pages 2950-2951], the Supreme Court made clear, “A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination.” “[T]he obligation imposed by Title VII is to provide an equal opportunity for each applicant regardless of race, without regard to whether members of the applicant’s race are already proportionately represented in the work force. [Citations.]” (Ibid.)
To summarize, the City’s own description of its Program—requiring that a responsive bid contain either a sufficient number of MBE/WBE subcontractors or documentation of outreach—demonstrates its invalidity under section 31. (See Coalition I, supra, 946 F.Supp. at pp. 1495-1496.) Satisfying the participation option discriminates against non-MBE’s/WBE’s on the basis of race and sex in the operation of public contracting to the extent the prime contractor utilizes sufficient MBE/WBE subcontractors to meet the City’s evidentiary presumption. Satisfying the outreach option grants preferential treatment because prime contractors must notify, solicit bids from, and negotiate with MBE’s and WBE’s, but may exclude non-MBE’s/WBE’s. If a contractor fails to satisfy either option, the City discriminates on the basis of race and sex by rejecting its bid out of hand even, as in this case, when that bid is the lowest otherwise responsive submission.
This result is precisely what the voters were told Proposition 209 would prohibit. “Programs designed to ensure that all persons—regardless of race or gender—are informed of opportunities and treated with equal dignity and respect will continue as before.” (Ballot Pamp., supra, rebuttal to argument against Prop. 209, p. 33.) By implication, programs such as the City’s that disseminate information on a selective basis would not continue. The Legislative Analyst also explained that “the measure would eliminate programs that give preference to women-owned or minority-owned companies on public contracts. . . . [¶] . . . [B]idders on contracts no longer would need to show ‘good faith efforts’ to use minority-owned or women-owned subcontractors. Thus, state and local governments would save money to the extent they otherwise would have rejected a low bidder—because the bidder did not make a ‘good faith effort’—and awarded the contract to a higher bidder.” (Id., Legis. Analyst’s analysis of Prop. 209, p. 31.)
*565 Although we find the City’s outreach option unconstitutional under section 31, we acknowledge that outreach may assume many forms, not all of which would be unlawful. (Cf. Lungren, supra, 48 Cal.App.4th 435.) Our holding is necessarily limited to the form at issue here, which requires prime contractors to notify, solicit, and negotiate with MBE/WBE subcontractors as well as justify rejection of their bids. Plainly, the voters intended to preserve outreach efforts to disseminate information about public employment, education, and contracting not predicated on an impermissible classification. (See Ballot Pamp., supra, rebuttal to argument against Prop. 209, p. 33; see also Lungren, supra, 48 Cal.App.4th at p. 442; cf. Domar Electric, Inc. v. City of Los Angeles (1994) 9 Cal.4th 161, 174 [36 Cal.Rptr.2d 521, 885 P.2d 934] [pre-Proposition 209 decision upholding city requirement “mandating reasonable good faith outreach to all types of subcontractor enterprises,” not just MBE’s and WBE’s, that sought “to increase opportunity and participation within the competitive bidding process”].) We express no opinion regarding the permissible parameters of such efforts.
III
The City and its amici curiae advance several arguments in support of the Program’s constitutionality, none of which is persuasive.
The City first contends Lungren, supra, 48 Cal.App.4th 435, established that “targeted” or “focused” outreach does not come within the scope of section 31. In Lungren, various parties brought a preelection challenge to the title and summary of Proposition 209 prepared by the Attorney General, asserting it was misleading because it failed to inform the voters the initiative would ban all “ ‘affirmative action.’ ” (Lungren, at p. 441.) The Court of Appeal rejected the challenge because the title contained “essentially verbatim recitations of the operative terms of the measure. The Attorney General has added nothing, omitted nothing and the words used are all subject to common understanding.” (Ibid.) The court then went on to note that “ ‘ “affirmative action” ’ ” had no commonly agreed-upon definition and that “[m]ost definitions of the term would include not only the conduct which Proposition 209 would ban, i.e., discrimination and preferential treatment, but also other efforts such as outreach programs.” (Id. at p. 442.)
From this single observation, which appears unnecessary to the holding (see Lungren, supra, 48 Cal.App.4th 435, 443 (conc. opn. of Sims, J.)), the City extrapolates that the voters must have understood and intended that the outreach component of its program would not run afoul of Proposition 209. The simple answer is that the Court of Appeal in Lungren was not considering the constitutionality of the City’s Program or the meaning of “discriminate” or “preferential treatment” as those terms apply to the Program. The *566 court also did not refer to “targeted” or “focused” outreach or to programs formulated to take into account race and sex. Moreover, both the Legislative Analyst’s analysis and the arguments against Proposition 209 indicated outreach would likely be eliminated by the initiative to the extent it operated on the basis of race or sex. (Ballot Pamp., supra, Legis. Analyst’s analysis of Prop. 209, p. 31; id., argument against Prop. 209, p. 33.)
The City also relies on the fact the ballot argument in favor of Proposition 209 did not indicate the initiative would prohibit “targeted” outreach. We do not read the ballot arguments as an exhaustive catalogue of the specific programs and measures that would fall under section 31. Rather, they spoke genetically, emphasizing that any action that discriminates or grants preferential treatment on the basis of race or sex would be forbidden. By the same token, they assured voters Proposition 209 “allows any program that does not discriminate, or prefer, because of race or sex, to continue.” (Ballot Pamp., supra, argument in favor of Prop. 209, p. 32.) “Affirmative action programs that don’t discriminate or grant preferential treatment will be Unchanged.” (Id., rebuttal to argument against Prop. 209, p. 33.) Impliedly, those programs that do discriminate would be illegal. Moreover, the opponents warned that the initiative “ “puts at risk every outreach program ....’” (Id., argument against Prop. 209, p. 33, quoting Gen. Colin Powell.) These indicia of voter intent leave no room for the City’s outreach requirement, which is overtly predicated on race and sex preferences.
The City and some amici curiae contend “focused” outreach is not a “preference” as that term is presently construed under Title VII and the equal protection clause. Considering the historical context of Proposition 209, this contention reflects a fundamental misperception of the electorate’s intent to “restate[] the historic Civil Rights Act . . . .” (Ballot Pamp., supra, argument in favor of Prop. 209, p. 32.) As we have explained, those who supported and enacted “the historic Civil Rights Act” sought to ensure equal opportunity for all and eliminate race and sex from decisionmaking in employment and other areas. By 1996, however, judicial construction of both the Act and the equal protection clause had engrafted a series of qualifications permitting race- and sex-conscious programs formulated to remediate the lingering effects of past discrimination or conspicuous imbalance in the work force. If the electorate had determined merely to reiterate this status quo, an initiative amending the state Constitution would be unnecessary. Rather, we have concluded the “something more” the voters intended (Coalition I, supra, 946 F.Supp. at p. 1489) was essentially a repudiation of the decisional authority that permitted such discrimination and preferential treatment, notwithstanding antecedent statutory and constitutional law to the contrary. (See also Coalition II, supra, 122 F.3d at p. 709, fn. 18.)
*567 The City’s assertion that its outreach requirement merely “expands the applicant pool” is both misleading and irrelevant. To the extent it automatically eliminates bids that fail to document outreach or meet the evidentiary hiring presumption, it reduces the number of otherwise qualified bids it considers responsive. Even if it did accomplish its purported goal, a benign motivation cannot sanction a requirement that conflicts with the proscription against discrimination and preferential treatment on the basis of race and sex. Moreover, the Civil Rights Act was intended only to remove the barriers to equal opportunity (Griggs, supra, 401 U.S. at pp. 430-431 [91 S.Ct. at pp. 853-854]), not maximize the number of applicants actually considered. (Furnco, supra, 438 U.S. at pp. 577-578 [98 S.Ct. at pp. 2949-2950].) Cases cited by the City as examples of impermissible programs more overtly preferential are equally beside the point. At best, they illustrate what would suffice, not what is necessary, to violate section 31.
In a related vein, the City and its amici curiae argue that equal protection does not preclude race-conscious programs. While true, this point has no bearing on our construction of section 31. Equal protection allows discrimination and preferential treatment whenever a court determines they are justified by a compelling state interest and are narrowly tailored to address an identified remedial need. (See, e.g., United States v. Paradise, supra, 480 U.S. at pp. 185-186 [107 S.Ct. at pp. 1073-1074] [approving racial quotas].) It does not, however, preclude a state from providing its citizens greater protection against both. (Cf. Shaw v. Reno (1993) 509 U.S. 630, 654 [113 S.Ct. 2816, 2830-2831, 125 L.Ed.2d 511] [with respect to equal protection, “courts must bear in mind the difference between what the law permits and what it requires”].) Unlike the equal protection clause, section 31 categorically prohibits discrimination and preferential treatment. Its literal language admits no “compelling state interest” exception; we find nothing to suggest the voters intended to include one sub silentio.
The fact that as currently interpreted Title VII and title VI allow outreach of the type the City requires misses the mark for the same reason. Rather than incorporate the judicial gloss of Weber and its progeny, the voters intended to remove it. “Let’s . . . return[] to the fundamentals of our democracy: individual achievement, equal opportunity and zero tolerance for discrimination against—or for—any individual.” (Ballot Pamp., supra, argument in favor of Prop. 209, p. 32.) As originally implemented, “Title VII tolerate[d] no racial discrimination, subtle or otherwise.” (McDonnell Douglas, supra, 411 U.S. at p. 801 [93 S.Ct. at p. 1824].) It was applied to “remove barriers that have operated ... to favor an identifiable group . . . over other employees.” (Griggs, supra, 401 U.S. at pp. 429-430 [91 S.Ct. at *568 p. 853].) With the approval of Proposition 209, the electorate chose to reassert the principle of equality of individual opportunity as a constitutional imperative.
Finally, the City and several amici curiae, including the United States, contend the Program is necessary to discharge the City’s duty under federal law to eradicate the discrimination against subcontractors documented by its disparity study. (See, e.g., Wygant, supra, 476 U.S. 267, 291 [106 S.Ct. 1842, 1856] (conc. opn. of O’Connor, J.); see also Croson, supra, 488 U.S. at p. 509 [109 S.Ct. at p. 730].) At oral argument, however, the San Jose City Attorney conceded the Program is “not constitutionally required” and “not federally mandated.” Even without this concession, we are unpersuaded of the argument for several reasons.
First, the United States Supreme Court “never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classification in order to remedy such discrimination.” (Wygant, supra, 476 U.S. at p. 274 [106 S.Ct. at p. 1847].) Thus, the only constitutional obligation is the “ ‘affirmative duty to desegregate’ ” (id. at p. 276 [106 S.Ct. at p. 1848], quoting Swann v. Board of Education (1971) 402 U.S. 1, 31-32 [91 S.Ct. 1267, 1283-1284, 28 L.Ed.2d 554]), also referred to as the duty to “disestablish” the results of intentional discrimination. (Board of Education v. Swann (1971) 402 U.S. 43, 46 [91 S.Ct. 1284, 1286, 28 L.Ed.2d 586]; see also Assoc. Gen. Contr. of Cal. v. City & County of S. F. (9th Cir. 1987) 813 F.2d 922, 929; Associated Gen., etc. v. San Francisco Sch. (9th Cir. 1980) 616 F.2d 1381, 1386.) Where the state or a political subdivision has intentionally discriminated, use of a race-conscious or race-specific remedy necessarily follows as the only, or at least the most likely, means of rectifying the resulting injury. (Board of Education v. Swann, supra, 402 U.S. at p. 46 [91 S.Ct. at p. 1286]; see Van Alstyne, supra, 46 U. Chi. L.Rev. at pp. 783-784.) The City’s disparity study, at best, creates only an inference of discrimination against MBE/WBE subcontractors by prime contractors; it does not establish intentional acts by the City.
Second, this argument ignores the distinction between actions the federal Constitution allows and those it demands. As the Ninth Circuit Court of Appeals observed in finding that Proposition 209 did not violate federal equal protection, “To hold that a democratically enacted affirmative action program is constitutionally permissible because the people have demonstrated a compelling state interest is hardly to hold that the program is *569 constitutionally required. The Fourteenth Amendment, lest we lose sight of the forest for the trees, does not require what it barely permits.” (Coalition II, supra, 122 F.3d at p. 709; see Shaw v. Reno, supra, 509 U.S. at p. 654 [113 S.Ct. at pp. 2830-2831].)
There is also no duty under federal statutory law to take corrective action in the absence of discrimination. The Supreme Court in Weber, supra, 443 U.S. 193, and Johnson, supra, 480 U.S. 616, only determined Title VII does not preclude an employer from utilizing race- and sex-conscious programs under certain circumstances. It did not find Title VII mandates such programs. In fact, Title VII expressly provides for the supremacy of state law “other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this sub-chapter.” (42 U.S.C. § 2000e-7.) Moreover, the federal courts have held Proposition 209 does not conflict with Titles VI, VII, or IX of the Civil Rights Act of 1964. (Coalition II, supra, 122 F.3d at pp. 709-719 [Title VII]; Coalition I, supra, 946 F.Supp. at pp. 1517-1519 [Titles VI and IX].) “The mere fact that affirmative action is permissible under the Title VI and IX regulations, and some judicial interpretation, does not require preemption of a state law that prohibits affirmative action.” (Coalition I, supra, 946 F.Supp. at p. 1518.)
Third, if it were determined the City had violated federal constitutional or statutory law, the supremacy clause as well as the express terms of Proposition 209 would dictate federal law prevails: “If any part or parts of [section 31] are found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit.” (§ 31, subd. (h); see also id., subds. (d) [preserving preexisting court orders and consent decrees] & (e) [preserving any action necessary to establish or maintain eligibility for federal funding].)
Finally, we question the City’s implicit premise that its Program meets the federal equal protection standard. As the Supreme Court explained in Wygant, supra, 476 U.S. 267, “the means chosen to accomplish the State’s asserted purpose must be specifically and narrowly framed to accomplish that purpose. [Citation.] ‘Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification.’ [Citation.]” (Id. at p. 280 [106 S.Ct. at p. 1850], fn. omitted.) The disparity study is not part of the record in this case. Without it, the court has no basis for measuring the fit between the Program and the goal of eliminating a disparity in the amount of contract dollars awarded MBE’s in comparison to non-MBE’s.
*570 Disposition
The judgment of the Court of Appeal is affirmed.
Mosk, J., Baxter, J., and Chin, J., concurred.

An MBE is defined as a business with at least 51 percent ownership or control by one or more minority persons, as the City’s municipal code defines “minority.” A WBE must be 51 percent owned by a woman or women, who also control and operate it.

Also by local ordinance, a contractor may not “discriminate or grant preferential treatment on the basis of race, sex, color, age, religion, sexual orientation, disability, ethnicity, or national origin, in the selecting of any subcontractor for work on a city or agency contract.” (San Jose Mun. Code, § 4.08.070, subd. B.) Prime contractors submitting bids on city projects must certify they have not unlawfully discriminated.

The City apparently interprets these latter requirements as prohibiting a prime contractor from rejecting a subcontractor’s proposal based upon race or sex. It is unclear, however, how it makes this determination.

Section 31 proscribes discrimination and preferential treatment on the basis of sex as well as race. (See post, at p. 559, fn. 12.) Our preliminary discussion focuses on the development of legal and philosophical norms concerning governmental actions relating to race because the *545 history of racial discrimination is the genesis of all we discuss here. At the same time, we do not ignore or discount the reality that women were long denied equality, albeit often for different reasons than racial or ethnic minorities. (See, e.g., Sanderson v. Niemann (1941) 17 Cal.2d 563, 569 [110 P.2d 1025] [by statute and decisional law husband had management and control of community property and must, with limited exceptions, bring all actions that concerned the community property]; Griffey v. Pacific Electric Ry. Co. (1922) 58 Cal.App. 509, 521 [209 P. 45] [married woman is “duty bound to follow her husband to any reasonable fit abode which he might select”]; Basler v. Sacramento Gas & Elec. Co. (1910) 158 Cal. 514, 518 [111 P. 530] [wife’s personal injury action barred “if [her husband’s] negligence contributed proximately to her injury (since under the laws of this state the recovery for her injuries is community property, in which the husband shares and over which he has control)”]; see also In the Matter of the Motion to Admit Miss Lavinia Goodell to the Bar of This Court (1875) 39 Wis. 232 [1875 WL 3615, * 8] [Wisconsin Supreme Court refused to admit first female applicant to the state bar, in part because the “peculiar qualities of womanhood ... are surely not qualifications for forensic strife”].) While the struggle for racial equality is paradigmatic, it is not singular in its influence on the law.

See also Loving v. Virginia (1967) 388 U.S. 1, 10 [87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010] (striking down state ban on interracial marriage; “The clear and central purpose of the Fourteenth Amendment was to' eliminate all official state sources of invidious racial discrimination in the States”); Anderson v. Martin (1964) 375 U.S. 399, 402 [84 S.Ct. 454, 456, 11 L.Ed.2d 430] (invalidating state statute requiring designation of candidates’ race on electoral ballots; “The vice . . . [is] not in the resulting injury but in the placing of the power of the State behind a racial classification that induces racial prejudice at the polls”); Shelley v. Kraemer (1948) 334 U.S. 1 [68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441] (finding Fourteenth Amendment violation in state court’s enforcement of restrictive covenants); Buchanan v. Warley (1917) 245 U.S. 60 [38 S.Ct. 16, 62 L.Ed. 149] (invalidating statute forbidding Blacks and Whites from moving into a block where the greater number of residences were occupied by persons of the other race); but see Korematsu v. United States (1944) 323 U.S. 214 [65 S.Ct. 193, 89 L.Ed. 194] (upholding order excluding citizens of Japanese ancestry from their homes located in West Coast war area and requiring detention at relocation centers); Hirabayashi v. United States (1943) 320 U.S. 81 [63 S.Ct. 1375, 87 L.Ed. 1774] (upholding curfew imposed only against citizens of Japanese ancestry).

Among other provisions, Title VII states: “It shall be an unlawful employment practice for an employer ... [¶] ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race, color, religion, sex, or national origin . . . .” (42 U.S.C. § 2000e-2(a)(1).)
Title VI of the Act provides in part: “No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.” (42 U.S.C. § 2000d.)
Many of the floor debates and other legislative history materials reference both titles. (See, e.g., Bakke II, supra, 438 U.S. at p. 287 [98 S.Ct. at pp. 2746-2747].)

With respect to proving a violation of Title VII, the Supreme Court explained in McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792, 802 [93 S.Ct. 1817, 1824, 36 L.Ed.2d 668] (McDonnell Douglas) that a complainant “must carry the initial burden under the statute of establishing a prima facie case of racial discrimination.” If the complainant establishes a prima facie case, “[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee’s rejection.” (Ibid.) If so, the complainant may counter with evidence the “stated reason for [his or her] rejection was in fact pretext.” (Id. at p. 804 [93 S.Ct. at p. 1825].)

Senator Humphrey expressed similar views regarding the purpose and effect of title VI: “ ‘[T]he bill has a simple purpose. That purpose is to give fellow citizens—Negroes—the same rights and opportunities that white people take for granted. . . . It is no more than what our Constitution guarantees.’ [Citation.]” (Bakke II, supra, 438 U.S. at p. 287 [98 S.Ct. at p. 2746], fn. omitted.)

A comparable evolution occurred in decisions involving equal protection challenges. Setting aside such holdings as Hughes v. Superior Court of California, supra, 339 U.S. 460, and Brown v. Board of Education, supra, 347 U.S. 483, five members of the Supreme Court in Bakke II, supra, 438 U.S. 265, expressed the view that the Constitution will tolerate race-based state action intended to remedy the effects of past discrimination, even on behalf of individuals who did not personally suffer as a result. (See Bakke II, at pp. 316-319 [98 S.Ct. at pp. 2761-2763] (lead opn. of Powell, J.); id. at pp. 324-326 & fn. 1 [98 S.Ct. at pp. 2765-2767] (conc. & dis. opn. of Brennan, J., in which White, Marshall, and Blackmun, JJ., joined).)
Thereafter, in Wygant v. Jackson Board of Education (1986) 476 U.S. 267, 274 [106 S.Ct. 1842, 1847, 90 L.Ed.2d 260] (Wygant), the court accepted the licitness of race-conscious remedies with the caveat “a public employer . . . must ensure that, before it embarks on an affirmative-action program, it has convincing evidence that remedial action is warranted.” (Id. *554 at p. 277 [106 S.Ct. at p. 1848]; see also Adarand Constructors, Inc. v. Pena (1995) 515 U.S. 200, 236-237 [115 S.Ct. 2097, 2117-2118, 132 L.Ed.2d 158] (Adarand) [allowing a “narrowly tailored race-based remedy" in response to “lingering effects of racial discrimination against minority groups” by federal agencies]; Croson, supra, 488 U.S. at p. 509 [109 S.Ct. at p. 730] [“Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality’s prime contractors, an inference of discriminatory exclusion could arise” and justify taking affirmative action to rectify the effects].) In United States v. Paradise (1987) 480 U.S. 149, 177 [107 S.Ct. 1053, 1069-1070, 94 L.Ed.2d 203], the high court expressly approved a judicial decree that included a racial quota for future promotions by the Alabama Department of Public Safety. Because the order was narrowly tailored to redress “pervasive, systematic, and obstinate discriminatory conduct of the Department" (id. at p. 167 [107 S.Ct. at p. 1064]), it did not offend equal protection even though none of the beneficiaries had experienced promotional discrimination.

California’s Legislature was active in banning discrimination during this period as well. As early as 1939, state law prohibited racial discrimination on public works projects. (Lab. Code, § 1735, added by Stats. 1939, ch. 643, § 1, p. 2068.) Beginning in 1959, the Unruh Civil Rights Act barred discrimination by “business establishments of every kind.” (Civ. Code, §§ 51, 52, as amended by Stats. 1959, ch. 1866, § 1, p. 4424.) In 1963, the Legislature passed the Rumford Fair Housing Act, which provided that “[t]he practice of discrimination because of race, color, religion, national origin, or ancestry ... is declared to be against public policy.” (Health & Saf. Code, former §§ 35700-35744, added by Stats. 1963, ch. 1853, § 2, p. 3823, and repealed by Stats. 1980, ch. 992, § 8, p. 3166, and replaced by Stats. 1980, ch. 992, § 4, p. 3140, adding Gov. Code, § 12900 et seq.; see also Civ. Code, §§ 53, 782.)

Neither did the court find a denial of equal protection under the federal or state Constitution. (Price, supra, 26 Cal.3d at pp. 277-285; see also DeRonde, supra, 28 Cal.3d at *558 pp. 882-891; Minnick v. Department of Corrections (1979) 95 Cal.App.3d 506, 519-523 [157 Cal.Rptr. 260].) Departing from the understanding it had articulated in Bakke I, supra, 18 Cal.3d at pages 48-63, the court relied substantially on its interpolation of the equal protection analysis in Bakke II, supra, 438 U.S. 265. (Price, supra, 26 Cal.3d at pp. 278-283; see ante, at p. 553, fn. 9.)

Section 31 further provides: “(b) This section shall apply only to action taken after the section’s effective date.
“(c) Nothing in this section shall be interpreted as prohibiting bona fide qualifications based on sex which are reasonably necessary to the normal operation of public employment, public education, or public contracting.
“(d) Nothing in this section shall be interpreted as invalidating any court order or consent decree which is in force as of the effective date of this section.
“(e) Nothing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the state.
“(f) For the purposes of this section, ‘state’ shall include, but not necessarily be limited to, the state itself, any city, county, city and county, public university system, including the University of California, community college district, school district, special district, or any other political subdivision or governmental instrumentality of or within the State.
“(g) The remedies available for violations of this section shall be the same, regardless of the injured party’s race, sex, color, ethnicity, or national origin, as are otherwise available for violations of then-existing California antidiscrimination law.
“(h) This section shall be self-executing. If any part or parts of this section are found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit. Any provision held invalid shall be severable from the remaining portions of this section.”

Contrary to the City’s argument, this determination does not render “preferential treatment” surplusage. An overt act of discrimination against one person does not require the granting of preferential treatment to another. Preferential treatment may, but does not necessarily, involve overt discrimination. “ ‘[P]references’ includes, at a minimum, programs or policies that use racial or gender classifications.” (Coalition for Economic Equity v. Wilson (N.D.Cal. 1996) 946 F.Supp. 1480, 1489, fn. 4 (Coalition I).)

As used in our discussion of section 31, “race” includes color, ethnicity, and national origin.