Stefan E. CHERESNIK; Allen Harman; John L. McGoldrick, Plaintiffs—Appellants,

v.

CITY AND COUNTY OF SAN FRANCISCO, a political subdivision of the State of California; Henry Berman; Larry Mazzola; Michael S. Strunsky; Linda Crayton; Caryl Ito, in their official capacities as members of the Airport Commission of the City and County of San Francisco; John Martin, in his official capacity as Director of the San Francisco International Airport. Defendants—Appellees.

No. 99–17575.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 16, 2000.

Decided Jan. 26, 2001.

---

Before KLEINFELD, TASHIMA, and BERZON, Circuit Judges.

### MEMORANDUM [1]

This is a dispute about whether an affirmative action plan San Francisco uses at its airport is permitted by the federal and state constitutions. But that issue has not yet been reached because the district court abstained. The issue before us is the applicability of *Pullman* abstention.

Facts.

The district court based its decision to abstain solely on the parties' pleadings which allege the following facts. Three plaintiffs sued the San Francisco Airport Commission, the director of the airport, and the municipality, for discriminating against them on account of their sex and race. Their complaint states that each of them applied for a promotion available to the next highest position, and each got past the first cut, to twelve applicants, and the second cut, to seven. But when the pool was narrowed to four, and they all turned out to be white, the process was started all over again because their race made them not sufficiently "racially diverse." Different finalists were then selected. The process was pursuant to the airport's "Equal Employment Opportunity and Diversity Plan" (the Plan). Plaintiffs sought declaratory judgment that the Plan violated the federal and state constitutions, injunctions against implementing it, injunctions requiring that they be promoted, and money damages.

The Plan says that the airport's "policy" is "to provide equal employment opportunity without regard" to ethnicity, sex, and numerous other characteristics. The plan has other provisions which may require that employment opportunities be allocated with regard to ethnicity and sex. The Plan says that management "strives for an employee population reflective of the cultural diversity" of the municipality and the traveling public. The Plan lays out a matrix of airport employees, sorting them by ethnicity and job category, and comparing their ethnic percentages with labor force availability and population in San Francisco and the Bay Area, in order to compare

1. This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

the employee population with ethnic and sex percentages "reflective of the cultural diversity" of the municipality and surrounding area.

The Plan says that "the Airport is above parity with respect to African American, Asian and Filipino employees," i.e., African Americans constitute 10.3% of the airport workers but only 8.2% of San Francisco and 9.1% of Bay Area labor force participants. The airport was short of its "goal" for Hispanics, American Indians and women. The numerical charts are not clear as to whether white males were over or under the airport goals, because "European Americans" of both sexes are lumped together, and are 38.4% of the airport employees but 52.2% and 62.4% of the San Francisco and Bay Area labor forces. Following the numerical breakdown of all 1441 airport employees, the Plan sorts out by sex and ethnicity the employees in each division. To meet its "goal," the Plan says that the airport will "ensure" the hiring of qualified "women, people of color and individuals with disabilities into many of its vacant positions," to meet "quantitative objectives."

The "quantitative objectives" are to be sought in part by "targeted recruitment and outreach activities," such as attending community-based job fairs. Plaintiffs do not challenge any of the recruitment and outreach activities.

In addition the Plan requires that an "EEO and Diversity Programs office" collect "data on all employees" in each department and "report this information to top management." The Plan directs that "Management and supervisors will be evaluated on performance in this area." "[S]uccess in implementing diversity staffing" is a "factor in evaluating the performance of managers and supervisors."

Recommendations regarding promotions are to be made "in light of the Airport's Diversity Staffing Plan." Managers and supervisors are required to work with the EEO and Diversity Programs director in meeting the hiring objective by "taking into account the utilization analysis, and the estimated availability of under-represented groups in the Airport's labor market." The EEO and Diversity Programs director is required, when personnel decisions arise, to "make recommendations in light of the Airport's Diversity Staffing Plan and employment good faith hiring efforts."

To achieve its goal of an "employee population reflective of the cultural diversity" of the locality, the Plan includes about 40 pages of tables providing the sex and ethnicity for each job classification at the airport. The Plan then determines if a particular sex or race is "under-utilized" in a given occupational category. For example, there are 184 employees assigned to the airport operations division. Of these 184 employees, 20 (10.9%) are Hispanics. The Plan says that the Hispanic percentage of the workforce population is 12.8%, so Hispanics are "under utilized" in the airport operations category by 2%, or 4 people. Thus a Plan goal is to employ 4 more Hispanics. Similarly, the Plan says that the design and construction division employs 40 people, but only 9(23%) women, compared to a 45.7% female workforce in the By Area. Thus the Plan concludes that women are "underutilized" in this category by 22.7%, or 9 employees.

The district court abstained pursuant to *Railroad Commission of Texas v. Pullman Co.*[2] from deciding the federal claims. Plaintiffs' claim that the airport Diversity Staffing Plan violated the California Constitution was dismissed without prejudice

2. 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

to filing it in state court. The district court stayed all further proceedings pending final resolution of the California State Constitution claim in state court. Plaintiffs' motion for preliminary injunction was "stricken from the Court's calendar."

## Analysis

### Pullman Abstention

■ We review a district court's decision to abstain under *Pullman* for abuse of discretion, though the discretion is narrow.[3] *Pullman* abstention is a "narrow exception to the district court's duty to decide cases properly before it."[4] We have relied upon *Canton v. Spokane School District No. 81*[5] which states that *Pullman* abstention is appropriate when: (1) the complaint touches a sensitive area of social policy; (2) such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy; and (3) the possibly determinative issue of state law is uncertain.[6] We review de novo whether the *Canton* requirements have been met.[7] All three factors must be present before abstention is allowed under *Pullman*.[8] If the factors are satisfied, then the district court's decision to abstain is reviewed for an abuse of discretion.

■ The California Constitution says that "[t]he state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."[9] One of the district court's grounds for abstention was that a California appellate decision[10] applying this constitutional provision to a similar government hiring program was before the California Supreme Court.[11] Since this case was submitted, the California Supreme Court issued its ruling.[12] This ruling may alter the third *Canton* factor, uncertainty of state law. We therefore remand this case to the district court to reconsider its abstention ruling in light of the California Supreme Court's decision in *Hi–Voltage*.

○

### Supplemental Jurisdiction

Appellants argue that the district court should have exercised its supplemental jurisdiction over its claim under the state constitution. That would defeat the purpose of abstaining on the federal constitutional claim while the California Supreme Court decided the state constitutional claim. *Cedar Shake* establishes that in

---

3. *C–Y Dev. Co. v. City of Redlands*, 703 F.2d 375 (9th cir.1983).

4. *Kollsman v. City of Los Angeles*, 737 F.2d 830, 833 (9th Cir.1984).

5. 498 F.2d 840, 845 (9th Cir.1974).

6. *See id.*

7. *Cedar Shake and Shingle Bureau v. City of Los Angeles*, 997 F.2d 620, 622 (9th Cir.1993); *see also, Almodovar v. Reiner*, 832 F.2d 1138, 1140 (9th Cir.1987) ("Whether these requirements were met is a mixed question of fact and law, that is more law than fact, and is therefore reviewed de novo.").

8. *See Cedar Shake* 997 F.2d at 622.

9. Cal. Const. art. I, § 31(a). This provision appeared on the ballot as "Proposition 209" and was adopted by the voters of California in 1996. *See Coalition for Econ. Equity v. Wilson*, 122 F.3d 692, 696 (9th Cir.1997).

10. *See Hi–Voltage Wire Works, Inc. v. City of San Jose*, 84 Cal.Rptr.2d 885 (Cal.App.1999).

11. *See Hi–Voltage Wire Works, Inc. v. City of San Jose*, 88 Cal.Rptr.2d 776, 983 P.2d 727 (1999).

12. *See Hi–Voltage Wire Works, Inc. v. City of San Jose*, 24 Cal.4th 537, 101 Cal.Rptr.2d 653, 12 P.3d 1068 (Cal.2000).

**882**

this circumstance, dismissal without prejudice of the state law claim and abstention on the federal claim was a proper exercise of discretion.[13] However, since we remand for the district court to reconsider its decision to abstain on the federal claim in light of *Hi–Voltage*, the district court may also wish to reconsider its discretionary dismissal of the state law claim in the same light.

Preliminary Injunction

Appellants argue that we should review the district court determination as a denial of a preliminary injunction. But we read the record as a stay rather than a denial. The district court "struck" the motion for preliminary injunction "from the court's calender," not on the merits, so that the motion could be revived if necessary after "final resolution of plaintiffs' state constitutional claim in state court":

> [A]ll further proceedings in this action shall be stayed pending final resolution of Plaintiff's Proposition 209 claim by the state courts. Defendants shall have no obligation to answer the first amended complaint until such further order by this court. Plaintiff's pending motion for a preliminary injunction is stricken from the Court's calendar.

The district court never ruled either way on the preliminary injunction, so we do not reach the merits. It was not an abuse of discretion for the district court to stay consideration of the preliminary injunction under the circumstances of this case.

VACATED and REMANDED.