**L. TARANGO TRUCKING,**
et al., Plaintiffs,

v.

**COUNTY OF CONTRA COSTA,**
et al., Defendants.

No. C–98–2955 WHO.

United States District Court,
N.D. California.

Nov. 28, 2001.

David J. Berger, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, Michelle Alexander, American Civil Liberties Union Foundation of Northern CA, Inc., Julian A. Gross, Employment Law Center, Legal Aid Society of S.F., Oren M. Sellstrom, Bay Area Lawyers Committee for Civil Rights, San Francisco, CA, Karl M. Manheim, Loyola Law School, Daniel Tokaji, American Civil Liberties Union Foundation of Southern California, Los Angeles, CA, for plaintiffs.

Ember Lee Shinn, Darren P. Roach, Gregg M. Ficks, Kathy M. Banke, Crosby, Heafey, Roach & May, Oakland, CA, Victor J. Westman, County Counsel, Gregory C. Harvey, Bernard L. Knapp, Office of County Counsel, Martinez, CA, Darren P. Roach, Crosby, Heafey, Roach & May, San Francisco, CA, for Defendants.

## OPINION AND AND ORDER

ORRICK, District Judge.

In this class action lawsuit, plaintiffs allege that the County of Contra Costa and its Board of Supervisors ("County") intentionally discriminate against women-owned and minority-owned businesses in awarding County contracts, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. A fifteen-day bench trial was held on June 4–7, 11–14, and 18–21, and October 15–17, 2001. The following constitutes the Court's findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## I.

This class action lawsuit was brought by L. Tarango Trucking; Lidia Tarango; Harrison's Consulting; Lisa Harrison;

F.E. Jordan Associates; Frederick Jordan; Laid Rite Floor Coverings; Glenn Fox; Hercules/Pinole/Rodeo, El Cerrito, Pittsburg and Richmond Branches of the NAACP; Northern California Latin Business Association; and the Coalition for Economic Equity. The defendants are the County and the members of its Board of Supervisors, in their official capacity: John Gioia, Gayle Uilkema, Donna Gerber, Joe Canciamilla, and Mark Desaulnier.

On February 12, 2001, the lawsuit was certified as a class action, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. Two subclasses were established:

1. All minority-owned business enterprises ("MBEs") who are ready, willing and otherwise qualified to enter into contracts to perform work for the County now and who will be ready, willing and otherwise qualified to so in the future and their minority owners; and

2. All women-owned business enterprises ("WBEs") who are ready, willing and otherwise qualified to enter into contracts to perform work for the County now and who will be ready, willing and otherwise qualified to so in the future and their women owners.

"MBE" is defined as a business that is at least 51 percent owned and whose management and daily business operations are controlled by one or more minority persons (Black, Latino(a), Asian/Pacific Islander, or American Indian/Alaskan Native) who are citizens or lawful permanent residents of the United States. The management, operations and control must be substantial, real, and ongoing, on a regular basis.

"WBE" is defined as a business that is at least 51 percent owned and whose management and daily business operations are controlled by one or more women who are citizens or lawful permanent residents of the United States. The management, operations and control must be substantial, real, and ongoing, on a regular basis.

An MBE or WBE is considered to be qualified to enter into contracts to perform work for the County if it possesses the ability and capacity necessary to competently perform work on County contracts, in the areas where the County spends money on public contracting.

The sole issue remaining for trial was whether defendants intentionally discriminate against MBEs and WBEs in the award of County contracts in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. Plaintiffs seek both declaratory and injunctive relief.

## II.

### A.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides, in relevant part, "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend. XIV.

Discrimination on the basis of race and sex is forbidden by the Equal Protection Clause. *See, e.g., Personnel Adm. of Mass. v. Feeney*, 442 U.S. 256, 272–73, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). In order to prove a violation of the Equal Protection Clause, the plaintiffs must prove that the defendants acted with discriminatory intent or purpose. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

"[O]fficial action will not be held unconstitutional solely because it results in

a racially [or sexually] disproportionate impact." *Village of Arlington Heights*, 429 U.S. at 264–65, 97 S.Ct. 555. "[D]isparate impact and foreseeable consequences, without more, do not establish a constitutional violation." *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). "[T]he Fourteenth Amendment guarantees equal laws, not equal results." *Feeney*, 442 U.S. at 273, 99 S.Ct. 2282.

Discriminatory impact, however, is not irrelevant. *Washington*, 426 U.S. at 241, 96 S.Ct. 2040. "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race [or sex] than another." *Id.* at 242, 96 S.Ct. 2040. "Sometimes a clear pattern, unexplainable on grounds other than race [or sex], emerges from the effect of state action even when the governing legislation appears neutral on its face." *Village of Arlington Heights*, 429 U.S. at 266, 97 S.Ct. 555. Adherence to a particular policy or practice with full knowledge of the predictable effects of such adherence upon racial or sex-based imbalance is one factor among many others that may be considered by a court in determining whether an inference of discriminatory intent should be drawn. *Penick*, 443 U.S. at 465, 99 S.Ct. 2941.

Discriminatory purpose implies that the decisionmaker selected or reaffirmed a course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group. *Feeney*, 442 U.S. at 279, 99 S.Ct. 2282. It is not necessary for the plaintiffs to prove that a discriminatory purpose was the sole reason for the government's action. *Village of Arlington Heights*, 429 U.S. at 265, 97 S.Ct. 555. It is sufficient to show that a discriminatory purpose was a motivating factor in the government's decision or action. *Id.* at 266, 97 S.Ct. 555.

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267, 97 S.Ct. 555. "The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." *Id.* "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." *Id.* "Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.* (footnote omitted). "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 268, 97 S.Ct. 555. "Beyond this requirement of showing intentional discrimination, however, there is no specific test that an equal protection plaintiff is required to meet." *FDIC v. Henderson*, 940 F.2d 465, 471 (9th Cir.1991).

## B.

Plaintiffs contend that the County is violating the Equal Protection Clause because (1) its contracting system has a disparate impact on MBE and WBEs, and the County has done nothing to remedy it; (2) the County's contracting system relies on subjective decisionmaking about when to seek competitive bids, which allows County decisionmakers to discriminate against MBE and WBE contractors; and (3) the County

has failed to follow through on affirmative action contracting programs that it established.

## C.

The only named plaintiff who testified at trial, or about whom any evidence otherwise was presented at trial, was Glenn Fox ("Fox").

### 1.

In order to obtain any relief on behalf of the class, plaintiffs must demonstrate that at least one of the named plaintiffs has standing. *Lewis v. Casey,* 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). "[E]ven named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Id.* (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 40, n. 20, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)) (quoting *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)).

> "Since they are not mere pleading requirements, but rather an indispensable part of the plaintiff's case, each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence spe-

cific facts, which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial."

*Id.* at 358 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

The minimum constitutional requirements for standing are (1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to speculative, that the injury will be redressed by a favorable decision. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. In an Equal Protection contracting case, a plaintiff can establish standing by showing that he was denied a contract because of the allegedly discriminatory acts of the governmental entity, or that discriminatory barriers in the contracting process prevented him from competing for contracts on an equal footing with other contractors. *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993).

### 2.

Fox did not establish at trial that he suffered an actual injury, or will suffer imminent injury, as a result of the County's allegedly unconstitutional contracting policies. Fox is co-owner of Laid Rite Floor Covering ("Laid Rite"), which in-

stalls flooring and carpeting. Laid Rite is 100 percent owned by African–American men, and, thus, is an MBE. In 2001, about 3 percent of Laid Rite's revenue will come from work on County projects. In the past, about 1 percent of Laid Rite's revenue came from County projects.

The County sends invitations to Laid Rite to bid on County contracts about three times a week. Laid Rite also has obtained information about County bidding opportunities through notices the County has placed in "California Construction Weekly." Laid Rite has also been contacted by several of the County's general contractors in conjunction with bidding opportunities on County contracts.

Fox complains that he was not given an opportunity to bid on a contract at the County's Merrithew Hospital project in 1994. Fox testified that he was told that the project he wanted to bid on was not going to be completed, but when he later dropped by the worksite, he saw that the work had in fact been done. He testified, however, that he had no idea whether the County installed that project itself. Fox presented no evidence at all from which the Court could infer that he was denied an opportunity to bid because of his race.

Later, Laid Rite was awarded a County contract relating to restrooms at County daycare facilities in Richmond. When Laid Rite successfully completed that contract, the County awarded it additional contracts. On direct examination, Fox recalled obtaining County contracts relating to the Public Defender's Office in Martinez, a health clinic in North Richmond, and the Housing Authority Administration Office in Martinez. On cross-examination, he recalled being awarded additional contracts. Fox also acknowledged that of the nine or ten County contracts on which he had bid as of May 7, 1999 (the date of his deposition), Laid Rite was awarded seven of those contracts, plus a portion of another contract.

The County also had an open purchase order ("open P.O.") with Laid Rite so that it could purchase flooring materials from Laid Rite for projects, as needed. The County purchased vinyl composition tile, base, different types of adhesives and other items from Laid Rite under the open P.O. After a year or two, the County rebid the open P.O. because prices went up. Although Laid Rite was given an opportunity to bid on it, it was not awarded the open P.O. the second time. There is no evidence that Laid Rite was denied the open P.O. the second time because of race.

Fox complained about the process he encountered when he bid on the Public Defender's Office project. Fox learned from another carpet vendor that the project was going to be bid. Fox contacted Ed Woodard ("Woodard"), at the County's Architectural Division, who visited Laid Rite and gave Fox information about the scope of the work that needed to be done. Woodard told Fox that he needed a lump-sum bid on flooring, carpet, and underlayment. According to Fox, Laid Rite had the lowest total bid, but Laid Rite was awarded only the underlayment, while another company was awarded the carpet contract. Fox acknowledged that the other company had a lower bid on the carpet portion of the bid, and that Laid Rite had the lower bid on the underlayment portion. Fox complains that he should have been granted the contract for both carpet and underlayment, because his total bid for carpet and underlayment, was lower than the other company's total bid. Fox acknowledged, however, that there was no reason to submit separate bid amounts for carpet and underlayment unless the County was going to consider those bids separately. Fox admitted that the County awarded the contract to the companies

that had the low bid for each portion of the contract. Although it may have made financial sense for the County to award both the carpet and underlayment contracts to Laid Rite, Fox has presented no evidence that racial discrimination entered into the County's decision on this contract.

The evidence shows that the County regularly solicits Laid Rite for bids, and regularly awards contracts to Laid Rite. Although Laid Rite might prefer to receive even more work from the County, the Court finds that plaintiffs have not proven that any County employee ever discriminated against Fox because of his race. Moreover, the County's contracting policies do not prevent him from competing on equal footing with other contractors. Fox receives regular invitations to bid, and he is awarded most of the contracts on which he bids. Thus, Fox has not shown that the County's allegedly unconstitutional contracting policies have ever injured him. Because he receives regular work from the County, and is regularly solicited for bids, he cannot show that the County's existing policies are likely to cause imminent injury to him in the future. Accordingly, Fox has not established any injury-in-fact as a result of the County's allegedly unconstitutional contracting policies that would give him standing to assert claims for violation of the Equal Protection Clause on behalf of the class.

### D.

Plaintiffs did not present any evidence about any of the other named plaintiffs at trial. Thus, there is no evidence that any of the named plaintiffs were injured, or are likely to be injured, by any of the County's allegedly unconstitutional contracting practices.

Plaintiffs did present evidence from a number of other MBE and WBE contractors. Any injuries suffered by members of the class who are not named plaintiffs are irrelevant, however, when there is no evidence that any of the named plaintiffs suffered any injury. *Lewis,* 518 U.S. at 358, 116 S.Ct. 2174; *Hodgers–Durgin v. De La Vina,* 199 F.3d 1037, 1044–45 (9th Cir.1999).

*Lewis* was a class action brought by prisoners incarcerated by the Arizona Department of Corrections who challenged various prison practices that the plaintiffs contended violated their constitutional rights of access to the courts. *Lewis,* 518 U.S. at 346, 116 S.Ct. 2174. After a trial on the merits, the district court found that only one of the named plaintiffs had been injured by any of the challenged prison practices. *Id.* at 358, 116 S.Ct. 2174. His injury was caused by the prison's failure to provide special services the plaintiff needed because of his illiteracy. *Id.* The district court nonetheless issued a permanent injunction mandating sweeping changes in the Arizona prison system. *Id.* at 347, 116 S.Ct. 2174. The court found that two groups of inmates were affected by the inadequacies the court found in the prison system: (1) lockdown prisoners, who were routinely denied physical access to the prison library, and (2) illiterate or non-English speaking inmates, who did not receive adequate legal assistance. *Id.*

The Supreme Court reversed and remanded for further proceedings, finding the district court's injunction to be overbroad. *Id.* at 364, 116 S.Ct. 2174. The Court held that any "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Id.* at 357, 116 S.Ct. 2174. " 'That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, uniden-

tified members of the class to which they belong and which they purport to represent." '" *Id.* (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 40, n. 20, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)) (quoting *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Because the only injury suffered by any of the named plaintiffs was the prison system's failure to provide legal assistance to compensate for one plaintiff's illiteracy, the Supreme Court held:

At the outset, therefore, we can eliminate from the proper scope of this injunction provisions directed at special services or special facilities required by non-English speakers, by prisoners in lockdown, and by the inmate population at large. If inadequacies of this character exist, they have not been found to have harmed any plaintiff in this lawsuit, and hence were not the proper object of this District Court's remediation.

*Id.* at 358, 116 S.Ct. 2174. Thus, *Lewis* stands for the proposition that the Court can issue a remedy in a class action only for violations of the law that have caused an injury in fact to one of the named plaintiffs.

The Ninth Circuit explicitly interpreted *Lewis* this way in the *Hodgers–Durgin* case. 199 F.3d at 1045. *Hodgers–Durgin* was a class action in which the plaintiffs alleged that the United States Border Patrol systemically engaged in traffic stops of motorists that violated the prohibition against unreasonable seizures set forth in the Fourth Amendment to the United States Constitution. *Id.* at 1038–39. The plaintiffs, as here, sought both a declaration that the defendants were violating the Constitution and an injunction against the unconstitutional conduct. *Id.* at 1039. The district court granted summary judgment for the defendants on the ground that the plaintiffs lacked standing to chal-

lenge the Border Patrol's practices. *Id.* at 1039.

The Ninth Circuit assumed, without deciding, that the plaintiffs had standing, but affirmed the district court on the ground that the plaintiffs had failed to establish sufficient likelihood of future injury to warrant equitable relief. *Id.* at 1039, 1042 n. 3. The court also found that the named plaintiffs' failure to establish a likelihood of future injury rendered their claim for declaratory relief unripe. *Id.* at 1044.

The plaintiffs in *Hodgers–Durgin* argued that they should be permitted to seek an injunction based on likelihood of future injury to unnamed class members. *Id.* at 1044. The Ninth Circuit agreed with the plaintiffs that there was evidence that three unnamed class members had suffered more frequent, and more recent, injuries than had the two named plaintiffs. *Id.* If those unnamed class members had been named plaintiffs, the court agreed that "they might well be able to demonstrate the likelihood of injury required to pursue equitable relief of the sort sought by Ms. Hodgers–Durgin." *Id.* at 1045. "As we read *Lewis,* however, system-wide injunctive relief is not available based on alleged injuries to unnamed members of a proposed class." *Id.*

Here, no class members other than Mr. Lopez and Ms. Hodgers–Durgin have chosen to join the action as named plaintiffs. Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief. Any injury unnamed class members may have suffered is simply irrelevant to the question whether the named plaintiffs are entitled to the injunctive relief they seek.

*Id.* Accordingly, the Ninth Circuit affirmed the district court's decision granting summary judgment to the defendants. *Id.*

Here, there is no evidence that any named plaintiff has suffered any injury in fact as a result of the challenged County contracting practices. Although plaintiffs also submitted evidence of the effects of those practices on other unnamed members of the class, that evidence is irrelevant because under *Lewis* and *Hodgers–Durgin* none of the named plaintiffs are entitled to seek either declaratory or injunctive relief on behalf of the unnamed class members.

### E.

On October 29, 2001, plaintiffs filed a motion for leave to amend their complaint to add as named plaintiffs two of the unnamed class members who testified at trial. Plaintiffs seek leave to amend their complaint to add the following new named plaintiffs: Clarence Hunt ("Hunt") and his business, California Personnel Resources ("CPR"); and Mary Evans ("Evans") and her business, Mary Helen's Sales.

Rule 15 of the Federal Rules of Civil Procedure governs the amendment of complaints. Where a responsive pleading has already been filed, the party seeking amendment "may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a).

In deciding whether justice requires granting leave to amend, factors to be considered include the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of the proposed amendment. *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 538 (9th Cir.1989) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). "These factors, however, are

not of equal weight in that delay, by itself, is insufficient to justify denial of leave to amend." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir.1987).

The decision whether to grant leave to amend remains solidly within the Court's discretion. *Acri v. International Ass'n of Machinists*, 781 F.2d 1393, 1398 (9th Cir.1986). Generally, leave to amend should be granted with "extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir.1990); *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir.1989). "[A]mendments to complaints are liberally allowed under the Federal Rules of Civil Procedure up to and even after trial, judgment, and appeal, in cases in which there is no harm to the defendant from the tardy amendment." *United States v. Security Pac. Bus. Credit, Inc.*, 956 F.2d 703, 707–08 (7th Cir.1992). *See also Levin v. Weissman*, 594 F.Supp. 322, 329 (E.D.Pa. 1984) (allowing amendment of complaint during trial to add new plaintiff where the amendment added no new claims, issues or evidence, and did not prejudice the defendants).

Here, although plaintiffs' motion comes after trial, there is no prejudice to defendants from plaintiffs' delay in seeking leave to amend. Hunt and Evans have already testified at trial, and defendants have had ample opportunity to cross-examine them. There is no sign of bad faith or dilatory motive because plaintiffs acknowledge that their desire to amend was sparked by the Court's request for further briefing on *Lewis*. Plaintiffs have amended their complaint only once before, so there is no repeated failure to cure deficiencies in their complaint by prior amendments. Plaintiffs' request to amend their complaint is futile, however, because the problem with plaintiffs' case is not that

they have chosen the wrong named plaintiffs to represent the class, but that they have not proven that the County discriminates against women-owned and minority-owned businesses, for the reasons set forth below.

### F.

Plaintiffs presented testimony from several class members who claimed that they had personally suffered discrimination because of race or sex in attempting to obtain contracts with the County. The Court finds that none of those witnesses demonstrated that the County discriminated against them because of their race or sex.

### 1.

■ Plaintiffs presented testimony from Hunt, the owner of CPR. CPR is not certified as an MBE with the County, but is certified as an MBE with the California Public Utilities Commission. CPR provides temporary clerical services and some accounting services, and has provided its services to major clients such as the City of Oakland and Pacific Bell.

In 1993, Hunt submitted a bid to the County for a three-year contract for temporary services. Hunt thought his bid was competitive, but the County rejected it. No evidence was submitted at trial from which the Court could conclude that Hunt's bid was rejected because he was an MBE contractor.

Hunt contended that the County has not responded to his efforts to have CPR added to the County's lists of available vendors, and that he has never been notified by the County of any opportunities to bid on County contracts. In fact, CPR was added to the County's list of potential bidders no later than 1996, and was sent a request for a bid for the temporary services contract in 1996.

In 1996, Hunt bid for the next three-year contract for temporary services. The County again rejected his bid. Hunt's bid was lower than the bids of some of the companies who were awarded the contract. Hunt's 1996 bid failed to comply with the County's requirements, however, because it did not include a description of how CPR would provide preemployment screening. The County attempted numerous times to contact Hunt so that he could fix the problems with his bid, but continually reached an answering machine. The County even sent an employee to Hunt's work address, but Hunt's office was closed and dark. By the time someone from CPR returned the County's calls, the decision of which contractors to place on the short-list for the contract had already been made. The Court finds that Hunt's defective bid and the County's inability to contact him accounted for its rejection of his bid. The County did not reject Hunt's bid because of his race.

### 2.

■ Plaintiffs presented testimony from Evans, the owner of Mary Helen's Sales, which is a certified WBE with the County. Mary Helen's Sales sells bulk food items to institutions such as county jails and state prisons. Although Evans has sold to prisons for twenty-one years and has had her own business for seven years, she has never sold any products to the County.

In March 2000, Evans met with John Berensen ("Berensen") and John Buckhalt ("Buckhalt") of the County to solicit business for Mary Helen's Sales. Berensen was the County purchasing manager, and Buckhalt is a buyer for the County.

Berensen and Buckhalt suggested that Evans could bid for sales to the County's meals-on-wheels account, but Evans was not interested in that account. Buckhalt also expressed interest in her ability to sell

bread to the County. Two weeks after that meeting, the County solicited a bid from her for candy bars for vending machines and canteen stores, but she did not bid on that contract because she does not sell those products. Shortly before trial, she received another request for a bid from the County for janitorial supplies, which she also does not sell.

Evans also met with Jeff Vickers at the County, who suggested that she meet with Les Littman ("Littman"). Littman was the County purchasing manager. Littman told her that the County mainly buys through a distributor in Southern California, but gave her forms to fill out so that she could be on the County's list of available bidders.

Evans believes the County is discriminating against her because of her sex by not providing her with requests for bids for the products she sells. In fact, however, Evans has received a request for bids on all of the County's food contracts that have been sent out to bid, except for the meals on wheels contract, which she testified she did not want. The County has not discriminated against her because of her sex.

### 3.

 Plaintiffs presented testimony from Marcy Li Wong ("Wong"), who is a principal of her own architectural firm. She testified that she has been certified as an MBE or WBE with the County. Wong has had contracts with such major entities as the University of California, the cities of Berkeley and San Francisco, Wells Fargo and Chevron.

Wong was awarded approximately six projects for the County in 1996, 1997, and 1998, and received praise from the County for those projects. In 1999, she was specifically solicited by the County to do a computer room expansion project. In 2000, she received additional work from the County on a previously awarded project.

Wong complains that she has not received any unsolicited requests for bids from the County recently, although she has obtained requests for bids from the County when she contacted the County about projects that she learned about on her own. At the end of 2000, Wong submitted a bid for a project at the County and was rejected. She was not selected for the short list for the project because a very strong field of candidates submitted bids.

The evidence shows that Wong has received roughly $500,000 in County contracts since 1998. She regularly does work for the County, and the County is happy with her work. There is simply no evidence that Wong has ever been discriminated against by the County because of her sex.

### 4.

 Todd Lewis ("Lewis"), principal of Omega Pacific Electrical Supply, Inc. ("Omega"), also testified. Omega is an electrical wholesale distributor that has supplied lighting equipment for San Francisco International Airport, the Golden Gate Bridge, BART, and the Casino San Pablo. Omega has been certified with the County as an MBE since about 1993.

Omega has regularly made sales calls on the County, but has never received a request for a bid from the County. Lewis acknowledged, however, that the County added his firm's name to a list of available MBE subcontractors that the County provided to prime contractors. Omega has, in fact, received requests for bids for subcontracting work from County contractors. It placed a bid for subcontracting work on the County's Merrithew Hospital project, but did not receive the contract. Omega has submitted other bids to prime contrac-

tors on County projects, and has been awarded a subcontract on one project. There is no evidence that the County or any prime contractor ever discriminated against Lewis and Omega because of race.

▮▮▮▮ Lewis and Omega and the other class members who complained about difficulties getting requests for bids from the County did not demonstrate that the County was discriminating against them because of their race or sex. Instead, the Court finds that there is institutional inertia at the County that results in a subtle bias in favor of contractors with whom the County is already doing business. The County updates its lists of potential contractors only haphazardly, and generally appears to be content to continue to do business with its preexisting contractors when that relationship is satisfactory. Although this creates barriers for new contractors who wish to do business with the County, it is not a result of intentional discrimination against women-owned and minority-owned contractors. Instead, it affects any contractor who has not previously done business with the County.

### G.

▮▮▮▮ Plaintiffs also failed to demonstrate that the County's contracting policies in general are motivated by intentional discrimination against women-owned and minority-owned contractors. Plaintiffs have never contended that any of the County's policies explicitly discriminate against women or minorities.

Instead, plaintiffs argue that the County's policies have a disparate impact on women and minorities. Plaintiffs contend that the County is aware of this disparate impact and has refused to do anything about it.

Plaintiffs also complain that the County places too much discretion in County employees to determine when to seek bids on contracts. As a result, many contracts do not receive bids at all. Plaintiffs contend that this creates a situation that permits discrimination against women and minorities.

Plaintiffs also complain that the County has not enforced its own affirmative action contracting policies. In particular, plaintiffs complain that the County has failed to require its departments to submit reports on the amount of contracts awarded to women-owned and minority-owned contractors.

### 1.

Plaintiffs have not demonstrated that the County's contracting policies have a disparate impact on women-owned and minority-owned contractors. It is true that the meager information that is available suggests that the County awards a low absolute number of contracts to women-owned and minority-owned contractors. There is no accurate data, however, on the number of women-owned and minority-owned contractors who are qualified to do business with the County. *See, e.g., City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 501, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (rejecting data showing disparity between number of contracts awarded to minority firms and minority population of the city); "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." (quoting *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)). Thus, there is no way to tell whether women and minorities are getting a proportionally lower percentage of contracts than other contractors when compared to the pool of available, qualified, contractors.

The only availability data that was presented at trial was from a 1992 study by the National Economic Research Associates, Inc. ("NERA"). That report itself was based on 1987 census data, which has been acknowledged to be faulty. Moreover, the NERA report did not take into account only the businesses that were qualified to do business with the County, because it also wanted to measure discrimination by private businesses. Thus, its availability numbers do not reflect the number of MBE and WBE businesses that were qualified to do business with the County in 1992. Even if the NERA report had set forth accurate availability statistics for 1992, the Court is not persuaded that those statistics accurately reflect the *current* availability, nearly ten years later, of women-owned and minority-owned contractors who are qualified to do business with the County.

No one has attempted to do an availability study since the NERA report was issued in 1992. In the absence of accurate current availability data, there is no data from which the Court can conclude that the County's contracting practices have a disparate impact on women-owned and minority-owned contractors.

■ Even if there were such a disparate impact, however, that alone is not enough to find intentional discrimination by the County. Plaintiffs contend that the County has known its contracting policies had a disparate impact on women and minorities since the 1990s and refused to do anything about it. Plaintiffs contend that this alleged indifference constitutes intentional discrimination.

■ It is true that discriminatory intent exists when a defendant is deliberately indifferent to known existing discrimination by someone over whom the defendant has authority and control. *Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134,

140 (2d Cir.1999). To establish a violation of the Equal Protection Clause, however, the plaintiff must show that the defendant's indifference was such that the defendant intended the discrimination to occur. *Id.* at 141. Thus, a defendant who deliberately allows known discriminatory acts to continue when it is within the defendant's control to stop them can be found liable for ratifying the discrimination. *See, e.g., EEOC v. Inland Marine Indus.*, 729 F.2d 1229, 1235 (9th Cir.1984). Such ratification constitutes sufficient intent to find the defendant liable for intentional discrimination. *Id.* at 1235.

Here, however, there is no evidence that the County knew that any of its employees were intentionally discriminating against women and minorities in awarding contracts. At most, it knew that low numbers of women and minorities were being awarded contracts, but it also knew that the data it was receiving was both incomplete and inaccurate. In addition, plaintiffs have failed to produce any evidence that any minority-owned or woman-owned contractor actually was subjected to unlawful discrimination by any County employee.

Plaintiffs have cited no case in which an entity has been found liable for intentional discrimination simply because it permitted a policy with disparate impact on women and minorities to continue. In fact, the Supreme Court has expressly held that there is no discriminatory intent, and, thus, no Equal Protection violation, unless the entity selected or reaffirmed a course of action at least in part *because of,* not merely in spite of, its adverse effects upon an identifiable group. *Feeney,* 442 U.S. at 279, 99 S.Ct. 2282. Here, plaintiffs failed to show that the County's contracting policies have a disparate impact on women and minorities. Even if they had proven disparate impact, however, they failed to show

that the County continued those policies even in part because of that disparate impact. There is simply no evidence that the County kept its contracting policies in place because they had a disparate impact on women and minorities.

2.

 Plaintiffs also complain that the County places too much discretion in County employees in determining when to seek bids on contracts, and in determining to whom contracts should be awarded. Plaintiffs contend that this unfettered discretion creates a situation that allows discrimination against women and minorities to occur.

Plaintiffs' expert, David Keen ("Keen"), managing director of BBC Research and Consulting ("BBC"), conducted a competition study, in which he attempted to determine whether there is evidence of competition in the award of County contracts. Keen concluded that the vast majority of the County's purchasing and professional/personal services contracts were awarded without competitive bidding; Keen found that there *was* evidence of competition in most County construction contracts. For purchasing contracts the County entered into between January 1999 and March 2000, Keen found no evidence of competition in 96 percent of these contracts. For professional/personal services contracts the County entered into between October 1997 and March 2000, Keen found that 98 percent showed no evidence of competition.

This study was unquestionably flawed. Defendants presented evidence showing competition in the award of many contracts that Keen erroneously identified as being awarded without competition. It is apparent from this evidence that Keen and his staff did not review all the evidence in the County's files reflecting competition in purchasing and professional/personal services contracts, or did not recognize that evidence in the documents they did review. The percentage of contracts that Keen found involved no competition is so high, however, that even if one takes into account the fact that Keen overlooked evidence of competition for many contracts, it still is easy for the Court to conclude that the majority of the County's purchasing and professional/personal services contracts were entered into without competitive bidding.

This does not, however, show discrimination against women-owned and minority-owned businesses. What it shows is that the County has made it difficult for *any* new business to get purchasing or professional/personal services contracts with the County. There is no evidence that any County employee chose not to submit a contract to competitive bidding in order to discriminate against women-owned or minority-owned contractors. Even if the lack of competitive bidding results in a disparate impact on women-owned and minority-owned businesses—and there is no such evidence—there is no evidence that the County deliberately allows this lack of competition to continue because of its impact on women-owned and minority-owned businesses. Accordingly, the fact that the County enters into a significant percentage of purchasing and professional/personal services contracts without competitive bidding does not show that the County is intentionally discriminating against women-owned and minority-owned businesses.

3.

Plaintiffs' remaining argument is that the County has not followed through on its affirmative action outreach program. In particular, plaintiffs complain that the County has not required its departments to submit regular reports on the number of contracts awarded to women and minorities, has failed to compile the data that it

has collected, and recently stopped collecting the data altogether. Plaintiffs also focus on confusion in the implementation of the County's 1998 Outreach program. Plaintiffs contend that the County's indifference to its own outreach program shows an intent to discriminate against women and minorities. This issue was the primary focus of both the first and second parts of the trial.

a.

The County has had a series of affirmative action programs over the past fifteen years. In the late 1980s, the County adopted an MBE and WBE affirmative action contracting program that set specific goals for MBE and WBE participation in County contracting. In 1989, the Supreme Court issued its *Croson* decision, in which the Court struck down a city's MBE set-aside program for construction contracts as a violation of the Equal Protection Clause. 488 U.S. at 510, 109 S.Ct. 706. The Court found that the city had failed to demonstrate a compelling interest in awarding construction contracts on the basis of race because the city did not have any evidence of discrimination in its construction industry. *Id.* at 505, 109 S.Ct. 706. "While the States and their subdivisions may take remedial action when they possess evidence that their own spending practices are exacerbating a pattern of prior discrimination, they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief." *Id.* at 504, 109 S.Ct. 706.

As a result of the *Croson* decision, the County commissioned NERA to conduct a detailed study of the County's MBE and WBE programs and policies. As a result of NERA's findings, the Board of Supervisors adopted a new MBE and WBE affirmative action program on November 17, 1992 ("the 1992 M/WBE Program"), which set new goals for MBE and WBE participation in County contracting.

Between 1992 and 1997, the County's Affirmative Action Officer, Emma Kuevor, held quarterly meetings with County departments to review the program with them and their efforts to comply with it. She also held workshops to explain the program to businesses who did business with the County, including MBE and WBE businesses.

In the November 1996 election, California voters approved Proposition 209, which amended the California Constitution to bar government affirmative action programs except under very limited circumstances. Cal. Const. Art. I, § 31. On April 8, 1997, the Ninth Circuit Court of Appeals upheld the constitutionality of Proposition 209. *Coalition for Economic Equity v. Wilson,* 110 F.3d 1431, 1447 (9th Cir.1997). On August 26, 1997, the Ninth Circuit denied an emergency motion to stay the mandate pending a petition to the United States Supreme Court for a writ of *certiorari,* and Proposition 209 went into effect. *Coalition for Economic Equity v. Wilson,* 122 F.3d 718 (9th Cir.1997).

Recognizing that the 1992 M/WBE Program violated Proposition 209, the Board of Supervisors repealed it on September 16, 1997. At the same time, the County suspended its own program for certifying contractors as MBEs or WBEs. The Board of Supervisors then began to develop new programs that could legally provide assistance to MBE and WBE contractors.

On December 9, 1997, the Board adopted an Interim Outreach program, which encouraged outreach to MBEs, WBEs, Small Business Enterprises ("SBEs"), and Local Business Enterprises ("LBEs"), without setting specific numerical goals for utilization of those types of businesses in County contracts. On August 11, 1998, the County adopted a Final

Outreach Program ("Outreach Program") for purchasing and professional/personal services contracts. Although the Outreach Program was adopted shortly after this lawsuit was filed on July 29, 1998, it was already being developed at the time the lawsuit was filed. The Outreach Program remains in effect today.

For purchasing contracts, the Outreach Program generally applies to all purchasing contracts that exceed $10,000, with some exceptions. For each purchasing contract covered under the Outreach Program, the Purchasing Manager/Agent is required to solicit quotations from at least 50 percent certified MBE, WBE, SBE or LBE vendors.

For professional/personal services contracts, the Outreach Program generally applies to contracts of $2,500 or more, with certain exceptions. When a request for services is made informally, a department is merely required to award the contract in a manner that is consistent with the Outreach Program. When a request for services is made formally, broad-based outreach to MBE, WBE, LBE and SBE contractors is encouraged.

The Interim Outreach Program remained in effect for construction contracts until the summer of 2000. At that time, the County adopted its Division E program, which is the current outreach program for the County's formal construction contracts. The Division E Program requires bidders for prime construction contracts to make good-faith efforts to reach out to MBE, WBE, SBE and LBE subcontractors.

On January 25, 2000, the Board of Supervisors adopted a Small Business Enterprise Program ("SBE Program") for construction contracts of $25,000 or less, and purchasing and professional/personal services contracts of $50,000 or less. The SBE program is still in effect today. Under the SBE program, 50 percent or more of the total dollar amount of such contracts is expected to be awarded to SBEs.

At trial, plaintiffs focused mainly on the Outreach Program, and presented evidence that many County decisionmakers were confused about the requirements of the Program, or even its existence. For example, John Buckhalt, one of the County's buyers, erroneously thought, until sometime after his July 2000 deposition, that the SBE Program replaced the Outreach Program. Gerald Bender, the Manager of the Architectural Services Division of the General Services Department, was unaware of the Outreach program for professional/personal services contracts until late 2000. Supervisor Uilkema testified that the Outreach Program was part of the SBE Program, which is not the case. In addition, although the Outreach Program contained certain reporting provisions, County departments rarely provided reports to the Affirmative Action Officer, and she rarely requested them.

b.

The County unquestionably has had little commitment to collecting accurate statistics on the amount of contract dollars it awards to MBE and WBE contractors.

As early as 1992, NERA sent the County computer software that would help the County maintain a database that would enable it to accurately count MBE and WBE utilization in County contracting. NERA also provided the County with consulting services to instruct the County how to collect the necessary data. In 1995, NERA sent the County another computer model that the County could use to collect MBE and WBE data. Despite this assistance from NERA, the County never established a working computer system that could collect and compile MBE and WBE data.

From 1994 to 1997, the County published annual Affirmative Action Progress Reports. The Progress Reports reported very low MBE/WBE participation rates each year for purchasing and professional/personal services contracts. It is undisputed that those figures were inaccurate, however, and that the County knew the figures were inaccurate. In 1994, 1995, and 1996, the reports stated that the County was working with data processing to ensure that each MBE and WBE contractor who had contracts with the County was being counted accurately, but no progress was ever made in terms of accurately compiling data on the County's utilization of MBE and WBE contractors. The 1997 report contained no data on MBE and WBE utilization in purchasing and professional/personal services contracts.

Since then, no report has ever been compiled that contains accurate countywide data on the amount of contracting dollars that are being awarded to MBE and WBE contractors. Some County departments submitted reports on their utilization of MBE and WBE contractors to the County's Affirmative Action Office, but not all departments did.

On November 30, 2000, the California Supreme Court issued its decision in *Hi–Voltage Wire Works, Inc. v. City of San Jose*, 24 Cal.4th 537, 101 Cal.Rptr.2d 653, 12 P.3d 1068 (2000), in which it struck down an MBE and WBE outreach program as a violation of Proposition 209. *Id.* at 542, 101 Cal.Rptr.2d at 656, 12 P.3d 1068. In the MBE and WBE program at issue, contractors bidding on city projects were required to utilize a specified percentage of minority and women subcontractors or to document their good-faith efforts to include minority and women subcontractors in their bids. *Id.* at 541, 101 Cal.Rptr.2d at 656, 12 P.3d 1068. Contractors were required to conduct outreach to MBE and WBE subcontractors, and were not required to conduct any outreach to non-MBE/non-WBE contractors. *Id.* at 561, 101 Cal.Rptr.2d at 671, 12 P.3d 1068. The Court found that this program plainly awarded preferential treatment to MBE and WBE contractors, in violation of Proposition 209. *Id.*

In December 2000, in response to the *Hi–Voltage* decision, the County ordered departments to stop reporting data on MBE and WBE contract awards, and instead directed them to report data only on solicitation of MBE, WBE, SBE, and LBE contractors.[1]

c.

 Plaintiffs' evidence demonstrates a somewhat half-hearted commitment to affirmative action by the County. The issue before this Court, however, is not whether the County should devote more efforts to affirmative action, or even whether it could legally do so under the California Constitution. The issue is whether the County's failure to rigorously enforce its own affirmative action policies, and its failure to collect data on its own utilization of minority and women contractors, violates the Equal Protection Clause of the Fourteenth Amendment to the Unit-

---

1. The Court rejects plaintiffs' repeated argument that defendants changed their reporting requirements in order to hide evidence of their discrimination against women and minority contractors. The purpose of the Outreach Program was, in fact, outreach. Thus, reports focusing on awards to minority and women contractors did not address the true focus of the program. Moreover, *Barlow* and

*Hi–Voltage* called into question the legality of any reporting requirement that focused on awards to minority and women contractors. The Court is convinced that the County changed its reporting requirements to bring the reporting requirements more in line with the purpose of the Outreach Program, and to avoid any possible conflict with the law, not to hide evidence of discrimination.

ed States Constitution. The Court finds that the County is not violating the Equal Protection Clause.

■ Although the constitutionality of affirmative action programs is a continually developing area of the law, the United States Supreme Court has repeatedly held that race-based and sex-based governmental decisionmaking is *permitted* under the Equal Protection Clause only under very limited circumstances. *See, e.g., Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (all racial classifications, imposed by whatever federal, state or local governmental actor, must be analyzed by a reviewing court under strict scrutiny.); *United States v. Virginia,* 518 U.S. 515, 531, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) ("Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action."). Plaintiffs' argument that the County is violating the Equal Protection Clause by failing to engage in more aggressive affirmative action fails to recognize the crucial distinction between conduct that is permitted by the Equal Protection Clause and conduct that is required.

> To hold that a democratically enacted affirmative action program is constitutionally permissible because the people have demonstrated a compelling state interest is hardly to hold that the program is constitutionally required. The Fourteenth Amendment, lest we lose sight of the forest for the trees, does not require what it barely permits.

*Coalition for Economic Equity v. Wilson,* 122 F.3d 692, 709 (1997).

Plaintiffs are correct, however, that the Court must consider evidence of the County's failure to comply with its own affirmative action program in determining whether the County intended to discriminate against minority and women contractors. In *Gonzales v. Police Department, City of San Jose, Cal.,* 901 F.2d 758 (9th Cir.1990), a case brought under Title VII of the Civil Rights Act of 1964, the Ninth Circuit held that a district court erred in failing to consider evidence of the city's repeated violations of its own affirmative action plan because such evidence "may be relevant to the question of discriminatory intent." *Id.* at 761. The Court noted, however, "that failure to follow an affirmative action plan is not *per se* a prima facie violation of Title VII." *Id.* This Court has considered the County's failure to vigorously enforce its affirmative action plans, and finds no evidence that those failures were caused by an intent to discriminate against women and minority contractors.

In fact, the evidence shows that County decisionmakers generally do make an effort to do outreach to women and minority contractors. The County presented numerous examples of women and minority contractors with whom it has recently done business. Each of the County's witnesses testified that they were unaware of any recent complaints from any bidders about discrimination in the award of any County contracts, and plaintiffs presented no evidence to the contrary.

In the face of repeated changes in the law, the County has consistently attempted to find ways to assist women and minority contractors, small businesses, and local businesses. When the *Croson* decision was issued, the County immediately commissioned a study from NERA to find a factual basis for retaining its goals-based affirmative action program. That NERA study, incidentally, found no evidence whatsoever that the County engaged in discrimination against women or minority contractors. When Proposition 209 went into effect, the County rescinded a program that it believed violated Proposition

209 and began developing new affirmative action outreach programs that could legally provide assistance to women and minorities who wished to do business with the County. When Supervisor Uilkema noticed at a public meeting that many of the women and minority contractors who wanted to do business with the County were small businesses, she developed the SBE program, which sets aside certain contracts for small businesses. When the *Hi–Voltage* decision invalidated an affirmative action program that required contractors to conduct outreach to MBE and WBE contractors, and to either use certain percentages of minority and women contractors or justify their inability to do so, the County immediately ordered its departments to stop reporting data on contracts awarded to MBE and WBE contractors, and start reporting data only on solicitations to MBE, WBE, SBE, and LBE contractors. In 1999, before the *Hi–Voltage* decision was issued, a California Court of Appeal had held that a state statute requiring state departments to report data on participation by minority, women, and disabled veteran business enterprises in state contracts was a violation of Proposition 209 because it was an unseverable part of an affirmative action statute previously found unconstitutional. *Barlow v. Davis*, 72 Cal.App.4th 1258, 1260, 85 Cal.Rptr.2d 752, 754 (1999).

In all of these instances, the County has demonstrated an awareness of the law and a commitment to following it, while at the same time attempting to assist women and minority contractors within the limits of the law. The evidence shows that the County's programs have in fact assisted MBE and WBE contractors in the County, even though those programs could have been enforced more aggressively. MBE and WBE contractors are being solicited for business by the County, and the County is, in fact, doing business with MBE and WBE contractors. Plaintiffs have not demonstrated that the County's failure to enforce its affirmative action programs more aggressively has been motivated in any way by an intent to discriminate against MBE and WBE contractors.

### H.

The Court has carefully considered all of the evidence and all of the arguments set forth by the parties. The Court generally has no disagreement with defendants' findings of fact and conclusions of law (Docket No. 527, filed July 13, 2001), and their supplemental findings of fact and conclusions of law (Docket No. 599, filed Oct. 29, 2001). Accordingly, those findings are incorporated into this opinion by reference, except to the extent any of them are contradicted by the findings set forth in the previous paragraphs of this Opinion and Order.

### III.

Accordingly,

IT IS HEREBY ORDERED that:

1. Plaintiffs' motion for leave to file an amended complaint is DENIED.

2. Judgment will be entered for defendants.